**UNITED STATES of America,**

v.

**WESTERN ELECTRIC COMPANY, et al.**

**Appeal of PACIFIC TELESIS GROUP, et al.**

No. 88–5050.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 26, 1989.

Decided Feb. 2, 1990.

Frank Cicero, Jr., Chicago, Ill., with whom Alfred Winchell Whittaker, Katherine C. Zeitlin, Washington, D.C., for American Information Technologies.

R. Frost Branon, Jr., Atlanta, Ga., for BellSouth Corp.

Raymond F. Burke and Gerald E. Murray, White Plains, N.Y., for NYNEX Corp.

Richard W. Odgers, Margaret deB. Brown and Randall E. Cape, San Francisco, Cal., for Pacific Telesis Group.

Robert A. Levetown, James R. Young and John Thorne, Washington, D.C., for Bell Atlantic Corp.

James D. Ellis, Paul G. Lane, Dan T. Foley and Liam S. Coonan, St. Louis, Mo., for Southwestern Bell Corp.

Jeffrey S. Bork, Washington, D.C., for U.S. West Inc. were on the joint brief for appellants Regional Bell Companies.

Mark J. Mathis, Washington, D.C. and John M. Goodman, for Bell Atlantic.

Edgar Mayfield, James S. Golden and Mary W. Marks, St. Louis, Mo., for South Western Bell Corp.

Martin Silverman, for NYNEX Corp., Abbott B. Sipsky, Jr., for BellSouth Corp.

Stanley J. Moore and C. Douglas Floyd, San Francisco, Cal., for Pacific Telesis Group, also entered appearances for appellants.

Marion Jetton, Atty., Dept. of Justice, with whom James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan, Barry Grossman and Nancy C. Garrison, Attorneys, Dept. of Justice, Washington, D.C., were on the brief for appellee U.S. of America in all cases.

David W. Carpenter, Chicago, Ill., with whom Francine J. Berry, Mark C. Rosenblum, Basking Ridge, N.J., and Howard J. Trienens, Chicago, Ill., were on the brief for appellee American Tel. & Tel. Co. in all cases.

Jonathan S. Hoak also entered an appearance for American Tel. & Tel. Co.

Herbert E. Marks and James L. Casserly, Washington, D.C., for Independent Data Communications Mfrs. Ass'n Inc.

Altert H. Kramer and Robert F. Aldrich, Washington, D.C., for North American Telecommunications Ass'n.

John W. Pettit and Thomas K. Crowe, Washington, D.C., for Tandy Corp.

Sue D. Blumenfeld and John L. McGrew, Washington, D.C., for Telecommunications Industry Ass'n, were on the joint brief for appellee Independent Data Communications Mfg. Ass'n, et al., in all cases.

Gary L. Lieber and E. Jay Finkel, Washington, D.C. entered appearances for appellee Maryland People's Counsel.

Martin T. McCue, Washington, D.C., entered an appearance for appellee U.S. Telephone Ass'n.

Gregory J. Krasovsky entered an appearance for appellee Florida Public Service Com'n.

William Paul Rodgers, Jr., Charles D. Gray, and Lisa M. Zaino entered appearances for appellee National Ass'n Regulatory Utility Com'n.

Simon Lazarus, III, and Lawrence R. Fullerton, Washington, D.C., entered appearances for appellee Hayes Micro Computer Products, Inc.

Andrew D. Lipman and Russell M. Blau, Washington, D.C., entered appearances, for appellee David Systems, Inc.

Milton Grossman, Washington, D.C., entered an appearance for appellee Western Union Corp.

Before MIKVA, EDWARDS and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case, we are again called upon to review a decision of the District Court interpreting the consent decree ("Decree") that ended the American Telephone and Telegraph Company ("AT & T") antitrust litigation. See *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131, 226–34 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Section II(D)(2) of the Decree provides that the Regional Holding Companies and the Bell Operating Companies (collectively "BOCs") may not "manufacture or provide telecommunications products or customer premises equipment." *Id.* at 227.[1] Appellee AT & T

---

1. The distinction that section II(D)(2) draws between "telecommunications products" and "customer premises equipment" is immaterial for purposes of this case. We use the terms "tele-communications products" and "telecommunications equipment" interchangeably to refer to both.

moved the District Court for a declaratory ruling that the word "manufacture" embraces not merely the *fabrication* of such equipment but also its *design and development.* The District Court granted AT & T's motion, *see United States v. Western Elec. Co.*, 675 F.Supp. 655 (D.D.C.1987), and the BOCs appeal. Because we find that the District Court's reading of the Decree best comports with "the text of the agreement and contemporaneous understandings of its purposes," *United States v. Western Elec. Co.*, 846 F.2d 1422, 1427 (D.C.Cir.) (*"Western Elec. III"*), *cert. denied* —— U.S. ——, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988), we affirm.

## I. BACKGROUND

Section II(D)'s "line-of-business" restrictions[2] constitute an essential component of the settlement that ended the Government's historic antitrust-enforcement actions against AT & T.[3] The theory underlying these suits was that AT & T had used its natural monopoly over local-exchange services to impede competition in related markets, including the markets for telecommunications products and for long-distance exchange services. By divesting AT & T of its control over local-exchange services and assigning such services to the BOCs, the Decree was designed to eliminate AT & T's ability to engage in the anticompetitive conduct attributed to it by the United States. And to assure that the BOCs, too, would be unable to abuse their respective regional monopolies, the Decree's line-of-business restrictions prohibit-

ed the BOCs from entering the telecommunications-equipment and long-distance service markets. *See generally American Tel. & Tel. Co.*, 552 F.Supp. at 160–66, 186–95.[4]

The instant appeal arises from AT & T's efforts to obtain enforcement of section II(D)(2)'s prohibition on the "manufacture [of] ... telecommunications equipment or customer premises equipment" by the BOCs. Beginning in April 1985, AT & T, along with several other companies, reported to the Department of Justice ("DOJ") that several BOCs were engaged in various allegedly prohibited manufacturing activities, including the design and development of telecommunications products. *See* Joint Appendix ("J.A.") 56–58. For over two years, the DOJ took no action. Ordered by the District Court to explain its position, *see id.* 26–28, the DOJ reported in May of 1987 that it regarded the meaning of the term "manufacture" to be too uncertain to justify enforcement, *see id.* 59–72. Shortly thereafter, the Assistant Attorney General in charge of the Antitrust Division of the DOJ indicated in testimony before Congress that the "historical record" suggested that the term "manufacture"—which is not defined explicitly by the Decree—encompasses only fabrication of telecommunications products. *See id.* 1226. AT & T then filed a motion in the District Court for a declaration that section II(D)(2) prohibits the BOCs from designing and developing telecommunications products, as well as from fabricating them. *See id.* 77.

---

**2.** Section II(D) provides that

no BOC shall, directly or through any affiliated enterprise:

    1. provide interexchange telecommunications services or information services; [or]

    2. manufacture or provide telecommunications products or customer premises equipment. . . .

*American Tel. & Tel. Co.*, 552 F.Supp. at 227. A third restriction—that the BOCs may not "provide any other product or service, except exchange telecommunications and exchange access service, that is not a natural monopoly service actually regulated by tariff"—has been eliminated by modification. *See United States v. Western Elec. Co.*, 673 F.Supp. 525, 597–99 (D.D.C.1987), *appeal pending*, No. 87–5388 (D.C. Cir. argued Dec. 6, 1989).

**3.** The first United States enforcement action was initiated in 1949 and culminated in a consent decree that did not implement the structural reforms sought in the complaint. *See United States v. Western Elec. Co.*, 1956 Trade Cas. (CCH) ¶ 68,246 (D.N.J.1956). The second action, culminating in the Decree, was initiated in 1974.

**4.** Section VIII(C) of the Decree directs the District Court to waive these limitations "upon a showing by the petitioning BOC that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter." *Id.* at 231.

The District Court granted AT & T's motion. *See United States v. Western Elec. Co.,* 675 F.Supp. 655 (D.D.C.1987). Rejecting the contentions of the BOCs, Judge Greene ruled that "[t]here is no valid basis for the position that only fabrication is prohibited by section II(D)(2)." *Id.* at 662. He based this conclusion not only on the ordinary or plain meaning of the term "manufacture," but also on "the contemporaneous intent of the parties." *Id.* Reconstructing the circumstances in which the Decree was adopted, Judge Greene observed that design and development of telecommunications products were even more instrumental to the anticompetitive behavior attributed to AT & T than was the company's actual fabrication of such products. *See id.* at 662–64. If the BOCs were now permitted to engage in the design and development of telecommunications products, Judge Greene determined, "they would have the same incentive and ability to undermine competition and competitors as did the Bell System" before divestiture. *Id.* at 664. In a footnote, Judge Greene applied this reasoning to software development, concluding that the Decree prohibited the BOCs from designing "software integral to [telecommunications] equipment hardware." *Id.* at 667 n. 54.

All seven BOCs have appealed from the District Court's decision. They challenge Judge Greene's conclusion that the Decree's manufacturing prohibition extends to design and development of telecommunications products generally, and his conclusion that the prohibition extends to software development in particular. Appellee AT & T, joined by a host of intervenor-appellee manufacturers, defends the court's ruling in full. Appellee United States, through the DOJ, defends the District Court's holding on design and development, but disagrees with the court's conclusion that the Decree's manufacturing prohibition affects any aspect of software development.

## II. ANALYSIS

### A. *Overview*

■ The principles governing interpretation of consent decrees in general and the AT & T Decree in particular are well settled. We read the Decree essentially as we would a contract. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975); *United States v. Western Elec. Co.,* 797 F.2d 1082, 1089 (D.C.Cir.1986) (*"Western Elec. II"*), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). Thus, while the meaning of the Decree's terms "must be discerned within its four corners," *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), our inquiry is guided by conventional "aids to construction," including "the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree," *ITT Continental Baking Co.,* 420 U.S. at 238, 95 S.Ct. at 935. In short, we must construe the Decree by reference to *its* "text ... and contemporaneous understandings of *its* purposes," *Western Elec. III,* 846 F.2d at 1427 (emphasis added), rather than "by reference to ... the purposes of *one* of the parties," *Armour,* 402 U.S. at 682, 91 S.Ct. at 1757 (emphasis added), or by "reference to the *legislation* the Government originally sought to enforce but never proved applicable through litigation," *ITT Continental Baking Co.,* 420 U.S. at 237, 95 S.Ct. at 935 (emphasis added).

The issue in this case is whether the District Court properly applied these principles in construing section II(D)(2), a question we examine *de novo. See Western Elec. III,* 846 F.2d at 1427. The BOCs assert that it did not. In their view, applying the Decree's manufacturing restriction to design and development of telecommunications products and telecommunications software contravenes both the "plain meaning" of the word "manufacture" and the expectations of the parties in entering the Decree. We disagree.

### B. *Design and Development of Telecommunications Products*

■ Looking first, as we must, to the text of section II(D)(2), we do not find

design and development to be contrary to the "plain meaning" of the word "manufacture." Definitions of manufacturing typically include activities equivalent to design and development. *See, e.g.,* I. ABRAMOVITZ, PRODUCTION MANAGEMENT 8–9, 11–13, 76 (1967) (discussing design and development as steps in "manufacturing process"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1378 (1976) (defining manufacture as "the act or process of making, *inventing, devising,* or fashioning...." (emphasis added)). Legal usage, too, indicates that in many contexts design and development can constitute manufacturing. *See, e.g., Charles Peckat Mfg. Co. v. Jarecki,* 196 F.2d 849, 851 (7th Cir.) (patent holder who contracts with independent fabricator is "manufacturer" for purposes of excise tax), *cert. denied,* 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678 (1952). Few if any authorities define manufacturing as limited solely to *fabrication.*

The BOCs point to several sources that do not expressly include design and development within the definition of manufacturing. *See, e.g.,* 9 OXFORD ENGLISH DICTIONARY 341 (2d ed. 1989) ("To make or fabricate from material; to produce by labour"). The most that this shows, however, is that "manufacture" is an inherently ambiguous term.[5] Even assuming this to be so, we would still reject the BOCs' position because we find that the "contemporaneous statements of [the Decree's] objectives," *Western Elec. III,* 846 F.2d at 1427, leave no question that the parties expected sec-

tion II(D)(2) to prohibit the design and development of telecommunications products. *See generally United States v. American Cyanamid Co.,* 719 F.2d 558, 564 (2d Cir. 1983) ("[W]hen the language of a consent decree provision is not clear on its face, a court of equity may, in construing the provision, consider the purpose of the provision in the overall context of the judgment at the time the judgment was entered."), *cert. denied,* 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984).

In its opinion certifying that the Decree satisfied the public-interest requirement of Antitrust Procedures and Penalties Act of 1974, 15 U.S.C. § 16(b)–(h) (1988) ("Tunney Act"),[6] the District Court noted that the Decree's line-of-business restrictions were "designed ... to avoid a recurrence of *the type of discrimination and cross-subsidization* that were the basis of the *AT & T* lawsuit." *See American Tel. & Tel.,* 552 F.Supp. at 142 (emphasis added). In particular, the trial court's opinion and the DOJ's Competitive Impact Statement ("CIS")[7] indicate that the Decree was intended to eliminate the risk of three specific forms of anticompetitive behavior associated with AT & T's predivestiture manufacturing practices. The first was AT & T's alleged efforts to impede independent manufacturers by affording Western Electric, AT & T's manufacturer subsidiary, privileged access to the technical specifications of AT & T's exchange systems. *See* 552 F.Supp. at 190–91; CIS at 15, *reprinted in* J.A. 807. The second was AT & T's alleged policy of

---

**5.** *See generally Union Wire Rope Corp. v. Atchison, T. & S.F. Ry. Co.,* 66 F.2d 965, 970 (8th Cir.) ("The word 'manufacture' is a broad general term susceptible of many applications and meanings. Like many general words, it invites uses which are definable only in connection with the immediate use."), *cert. denied,* 290 U.S. 686, 54 S.Ct. 122, 78 L.Ed. 591 (1933).

**6.** Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest. 15 U.S.C. § 16(e).

**7.** The Tunney Act directs the DOJ to submit a Competitive Impact Statement whenever it proposes to settle an antitrust action. The statement must describe, *inter alia,* "the nature and

purpose of the" underlying litigation; "the practices or events giving rise to the alleged violation of the antitrust laws"; and "the proposal for a consent judgment, including ... the anticipated effects on competition of such relief." 15 U.S.C. § 16(b). Insofar as Congress intended the record generated by Tunney Act proceedings "to foreclose future disputes following entry of ... a consent judgment concerning decree language or the intentions of the parties," H.REP. No. 1463, 93d Cong., 2d Sess. 8 (1974), U.S.Code Cong. & Admin.News 1974, pp. 6535, 6539, we may look to the CIS and the District Court's Tunney Act opinion as sources of the parties' jointly intended purpose in entering the Decree. *See generally Note, Construction and Modification of Antitrust Decrees: New Approaches after the Antitrust Procedures and Penalties Act of 1974,* 77 COLUM.L.REV. 296, 309–10 (1977).

"cross-subsidizing" Western Electric's development efforts through funds derived from AT & T's local-exchange monopoly, permitting Western Electric to undercut its competitors while passing on its losses to AT & T's service customers. *See* 552 F.Supp. at 190–91; CIS at 40, *reprinted in* J.A. 832. And the third was AT & T's alleged "favoritism"—its willingness to buy Western Electric products instead of cheaper, better products manufactured by Western Electric's competitors. *See* 552 F.Supp. at 190–91; CIS at 41–42, *reprinted in* J.A. 833–34.

Insofar as the Decree is designed to deprive the BOCs of "both the ability and the incentive" to engage in these practices, 552 F.Supp. at 187; CIS 40, *reprinted in* J.A. at 832, it cannot be credibly argued that section II(D)(2)'s manufacturing prohibition applies only to fabrication. The anticompetitive behavior attributed to AT & T revolved around AT & T's design and development activities, not just Western Electric's fabrication of telecommunications products. *See* CIS at 15, 40–41, *reprinted in* J.A. 807, 832–33.[8] If the BOCs were permitted to design and develop such equipment, they could similarly establish unregulated "mini-Western Electric" subsidiaries, which could contract-out fabrication work. The BOCs could then prefer their subsidiaries over competing manufacturers by access discrimination and favoritism, recouping the illicit profits by repurchasing the finished products at inflated prices passed on to the BOCs' local-exchange customers. The District Court's reading of the scope of the Decree's manufacturing prohibition is thus perfectly consistent with the Decree's "fundamental purpose to stymie efforts by a local monopoly to use its stranglehold on essential facilities and services to thwart effective competition in areas where its monopoly position was not protected by the [Decree]." *Western Elec. III*, 846 F.2d at 1429; *see Western Elec. II*, 797 F.2d at

1088 (noting "[D]ecree's objective of sharply limiting the ability of businesses with bottleneck control of local telephone service to utilize their monopoly advantages to affect competition in competitive markets").

Contrary to the BOCs' arguments, this reading of the Decree does not contravene *Armour* or *ITT Continental Baking Co.* The District Court's interpretation of the Decree is not designed to implement the purpose of only one party, *see Armour*, 402 U.S. at 682, 91 S.Ct. at 1757, or to implement the purpose of the Sherman Act independently of the parties' intentions, *see ITT Continental Baking Co.*, 420 U.S. at 236–37, 95 S.Ct. at 934–35. As the contemporaneous statements of *both* parties make clear, the terms on which AT & T and the United States settled the AT & T litigation were intended to eliminate "the *potential* for monopoly abuse in the future" by "remov[ing], clearly and efficiently, the *structural problems* that have given rise to the controversies between the United States and AT & T over the last three decades." CIS at 8, *reprinted in* J.A. 800 (emphasis added); *see* Reply Comments of the American Telephone and Telegraph Co. at 45 (May 21, 1982), *reprinted in* J.A. 860 (noting that "[i]n its present structure, AT & T faces the prospect of being repeatedly and interminably embroiled in litigation" and that "[u]nder the Decree, that source of controversy disappears"); *id.* at 136–37 (making same point), *reprinted in* J.A. 865–66.[9] Thus, the District Court's interpretation of the Decree's manufacturing prohibitions implements the parties' *joint purpose* to avoid future legal disputes concerning the BOCs' compliance with the antitrust laws by removing from them the power to engage in the anticompetitive behavior attributed to the predivestiture AT & T enterprise. *See generally White v. Roughton*, 689 F.2d 118, 119–20 (7th Cir. 1982), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983).

---

**8.** Research and development for telecommunications products was performed by AT & T's Bell Laboratories. *See* J.A. 398–402, 458–59.

**9.** Because the BOCs were the wholly owned subsidiaries of AT & T at the time the Decree was entered, the intentions of AT & T can be imputed to the BOCs. *See Western Elec. II*, 797 F.2d at 1087–88.

The BOCs argue nonetheless that the parties affirmatively contemplated that the BOCs would engage in the design and development of telecommunications equipment. They note that section I(B) of the Decree permits the BOCs to maintain "a centralized organization for the provision of engineering." *American Tel. & Tel.*, 552 F.Supp. at 227. They also point to the Plan of Reorganization ("POR"), filed by AT & T pursuant to section I(A), *see id.* at 226, which provided for the transfer of various technical personnel, facilities and information from AT & T to the BOCs.

We are not persuaded. As Judge Greene noted, *see* 675 F.Supp. at 666–68, section I(B) and most of the relevant provisions of the POR, *see* POR at 335–47, *reprinted in* J.A. 889–901, pertain to engineering activities essential to provision of authorized *local-exchange services*, not design and development activities essential to prohibited *manufacturing of telecommunications products*.[10] The other cited portions of the POR require the transfer, upon specified contingencies, of technical information necessary to develop equipment for providing AT & T's long-distance exchange competitors equal access to the BOCs' local-exchange networks, *see* POR at 429–30, *reprinted in* J.A. 938–39, an obligation imposed upon the BOCs by Appendix B of the Decree, *see American Tel. & Tel. Co.*, 552 F.Supp. at 232–34. Indeed, because it provides for transfer of the personnel, facilities and information necessary for these services alone, the POR constitutes another source of evidence that the parties did *not* intend the BOCs to be free to engage in *product* design and development generally.[11]

10. The District Court also relied on this distinction in its opinion approving the POR. *See United States v. Western Elec. Co.*, 569 F.Supp. 1057, 1116–17 (D.D.C.), *aff'd sub nom. California v. United States*, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).

11. For similar reasons, we do not accept the BOCs' argument that because section I(C) refers to "research, *development, manufacturing*, and other support services," *see American Tel. & Tel. Co.*, 552 F.Supp. at 227 (emphasis added), "development" and "manufacturing" must be treat-

Nor do we find convincing the BOCs' contention that the equation of "manufacture" with "fabrication" for purposes of section II(D)(2) can be inferred from the DOJ's failure to take action on AT & T's initial complaints. First, the BOCs do not accurately recount the history of the DOJ's enforcement posture. On at least one occasion *before* April 1985, the DOJ took the position that the Decree's manufacturing prohibitions barred the BOCs from "ent[ering] into the business of *designing* telecommunications equipment (even though fabrication would be subcontracted to another firm)." Response of the United States to the Motion of BellSouth for a Waiver Permitting It to Provide Services and Equipment to NASA at 6 n.* (Mar. 26, 1984), *reprinted in* J.A. 1072 (emphasis added). Moreover, notwithstanding its initial uncertainties, the DOJ below *rejected* the BOCs' narrow reading of the Decree's manufacturing prohibition, *see* J.A. 235, 250, and now *defends* the District Court's ruling that the Decree's manufacturing prohibition extends to design and development of telecommunications equipment generally.

Second, *ex post* constructions by the parties are not probative of the meaning of a consent decree. *Cf. United States v. Atlantic Refining Co.*, 360 U.S. 19, 23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959) (rejecting Government attempt to read decree more restrictively than in past). The relevant "understanding[ ]" is the one that the parties held "contemporaneous[ly]" with the Decree's formation. *Western Elec. III*, 846 F.2d at 1427; *see also White*, 689 F.2d at 120 (noting and applying same principle). As we have explained, upon entering the Decree, the parties clearly intended for sec-

ed as distinct under the Decree generally. Section I(C) imposes support obligations on AT & T relating to the BOCs' provision of local-exchange services; it does not follow that this section's wording should displace inferences properly drawn from the parties' stated intentions on the scope of the Decree's manufacturing prohibitions. The BOCs' contention to the contrary "rests on the unrealistic premise that all legal instruments are drafted with complete economy of language." *White*, 689 F.2d at 120.

tion II(D)(2) to apply to design and development of telecommunications products.

## C. *Software Development*

We also have no difficulty in affirming the District Court's determination that section II(D)(2) extends to the development of "software integral to [telecommunications] equipment hardware." 675 F.Supp. at 667 n. 54. The BOCs, joined by the DOJ, maintain that this ruling, too, cannot be reconciled with the "plain meaning" of the term "manufacture." But once it is determined that the parties intended for section II(D)(2) to embrace design and development of telecommunications equipment, it takes no additional argument to conclude that software programming essential to the design and development of such equipment is prohibited. Indeed, because "firmware" circuitry has largely supplanted the more cumbersome vacuum tubes, wires and switches that formerly comprised the heart of many pieces of telecommunications equipment, the reading of section II(D)(2) urged by the DOJ would leave the BOCs free to perform the most significant design and development functions associated with the manufacture of telecommunications products. *See generally* P. HUBER, THE GEODESIC NETWORK: 1987 REPORT ON COMPETITION IN THE TELEPHONE INDUSTRY 14.20 (1987) (noting that "[a] very substantial fraction of the" prefabrication costs of producing telecommunications equipment "go[es] for software design and development"). Permitting the BOCs to engage in the development of such software would thus create the types of anticompetitive risks that section II(D)(2) was intended to eliminate.

We do not mean to say that the development of *all* forms of telecommunications software is foreclosed to the BOCs. As the District Court recognized, *see* 675 F.Supp. at 667 n. 54, the Decree does not restrict software development relating to the design and operation of the BOCs' local-ex-

change networks.[12] That is why the District Court—properly in our view—read section II(D)(2) to apply only to the development of "software *integral* to [telecommunications] equipment hardware, also known as firmware." *Id.* (emphasis added).

The BOCs point out that many software applications can be used both for "firmware" integral to a particular piece of telecommunications equipment and for the design and operation of the local-exchange networks. This contention, which we assume to be true, does not render the District Court's decision erroneous. We understand section II(D)(2) to prohibit only the development of software that is integral to the design and development of telecommunications equipment hardware; it does not apply to software applications that are related principally to the provision of local-exchange services. If the status of a particular software application is uncertain under this rule, the BOCs remain free to seek guidance from the DOJ or the District Court before proceeding with development.

## III. CONCLUSION

Our decisions make clear that when the plain meaning of the Decree's language admits of ambiguity, the District Court should read the Decree's line-of-business restrictions in light of the parties' *jointly intended* "purpose to stymie efforts by a local monopoly to use its stranglehold on essential facilities and services to thwart effective competition in areas where its monopoly position was not protected by the [Decree]." *Western Elec. III,* 846 F.2d at 1429 We believe that the word "manufacture," as it appears in section II(D)(2), on its own connotes design and development in addition to mere fabrication of telecommunications equipment. The parties' contemporaneous statements of their intention to deprive the BOCs of the ability and incentive to engage in the anticompetitive behavior attributed to predivestiture AT & T remove even the slightest doubt about this

---

**12.** This understanding is reflected in the POR, which transferred to the BOCs facilities and information essential to the development of software related to network engineering but withheld from them information and facilities

essential to the development of software related to manufacturing telecommunications equipment generally. *See* POR at 347–68, *reprinted in* J.A. 901–22; *see also Western Elec.,* 569 F.Supp. at 1128–29 & n. 5 (approving POR on this basis).

conclusion. Because we find that the District Court properly construed section II(D)(2), we affirm its decision in full.

*Affirmed.*