DR PEPPER/SEVEN-UP COMPANIES, INC., et al., Plaintiffs,

v.

FEDERAL TRADE COMMISSION, Defendant.

Civ. A. No. 92–2760.

United States District Court, District of Columbia.

Oct. 21, 1993.

---

Philip D. Bartz, Leslie J. Cloutier, Morrison & Foerster, Washington, DC, for Dr Pepper/Seven–Up Companies, Inc.

Peter E. Greene, Skadden, Arps, Slate, Meagher & Flom, New York City, Gary A. MacDonald, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, for Harold A. Honickman.

Jeffrey T. Sprung, Asst. U.S. Atty., Melvin H. Orlans, Office of Gen. Counsel, F.T.C., Washington, DC, for F.T.C.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

This case concerns the bottling and distribution of Seven–Up brand soft drinks in the metropolitan New York City area. It is the second of two related lawsuits brought by plaintiffs Harold A. Honickman ("Mr. Honickman") and Dr Pepper/Seven–Up Companies, Inc. ("DPSU") against the Federal Trade Commission ("FTC" or "the Commission"), challenging the Commission's refusal to approve proposed acquisitions by Mr. Honickman of certain soft drink bottling assets pursuant to a 1991 Consent Order. The earlier case, referred to here as *DPSU I* and presently on partial remand to the FTC, concerned Mr. Honickman's proposed acquisition of assets of the now defunct Brooklyn Bottling Company ("Seven–Up Brooklyn"). *Dr Pepper/Seven–Up Cos. v. FTC*, 798 F.Supp. 762 (D.D.C.1992), *aff'd in part and rev'd in part*, 991 F.2d 859 (D.C.Cir.1993). This case concerns distribution rights formerly held by the also defunct New York Seven–Up Bottling Company ("New York Bottling") and is now before this Court on cross-motions for summary judgment.[1] For the reasons set forth below, the Court will grant plaintiffs' motion for summary judgment and deny defendant's cross-motion.

### THE PARTIES

Mr. Honickman owns interests in and controls all voting rights of the Canada Dry Bottling Company of New York and the Pepsi Cola Bottling Company of New York, Inc., which are bottlers and distributors of soft drinks in New York State. AR 4.[2] DPSU is a manufacturer of soft drink concentrate, in particular of "Seven–Up," a leading lemon-lime flavored soft drink brand. Like other major concentrate manufacturers, DPSU does not distribute Seven–Up directly to consumers, but rather grants exclusive territorial marketing rights to bottlers to do so. New York Bottling was one such franchisee, with rights to bottle and distribute Seven–Up and other soft drinks in a portion of the lucrative New York metropolitan market before it ceased operations in October 1991. AR 6000.[3] DPSU and Mr. Honickman now want the latter to obtain the licensing rights that would enable him to bottle and distribute Seven–Up brand carbonated soft drinks ("CSDs") in territory formerly served by New York Bottling.

In the case at bar, plaintiffs seek judicial review of the FTC's decision to deny prior approval in part to Mr. Honickman's proposed acquisition of these rights. In an opinion letter dated November 16, 1992, the Commission determined, first, that this proposed acquisition was subject to a 1991 Consent Order settling other litigation between

---

1. *DPSU I* was heard and decided by the late Judge George H. Revercomb. The case at bar was also originally assigned to Judge Revercomb, who heard oral argument on the instant cross-motions on June 7, 1993. The case was reassigned to this Court after Judge Revercomb's death. In addition to reviewing the extensive Administrative Record ("AR") and the briefs, the Court has also reviewed the transcript of the June 7 hearing.

2. Citations to the administrative record in this case are given herein as "AR ——."

3. Prior to its demise in October, 1991, New York Bottling's franchise territory covered Manhattan, the Bronx, and Westchester counties in New York, nine counties New Jersey, and parts of Connecticut. AR 6827. Apart from Seven–Up, New York Bottling also held distribution franchises for RC Cola (Royal Crown), Barq's, Perrier, Hawaiian Punch, and Crush (Cadbury-Schweppes). *Id.;* AR 5288.

Mr. Honickman and the FTC and, second, that the acquisition would likely have an anticompetitive impact on the market for CSDs in parts of Manhattan, the Bronx, and Westchester Counties, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. AR 6044–6065. Accordingly, the FTC denied his request for prior approval with respect to those areas.[4] Plaintiffs contend that these decisions are arbitrary and capricious, and that the FTC's rejection of Mr. Honickman's application for prior approval also violates his due process rights and substantive antitrust law.

## BACKGROUND

Mr. Honickman's previous efforts to acquire rights to distribute Seven–Up in the metropolitan New York area and his involvement with the FTC in that connection are recounted in detail in Judge Revercomb's Memorandum Opinion in *DPSU I* and need not be repeated at length here. *See DPSU I*, 798 F.Supp. at 764–68. It suffices to say that Mr. Honickman's acquisition of the franchise rights and assets of Seven–Up Brooklyn was the subject of an administrative complaint brought by the FTC on November 2, 1989. *See id.* at 765.[5] Subsequently, Mr. Honickman and the FTC entered into an "Agreement Containing Consent Order" ("the Settlement Agreement") in January, 1991, to settle this litigation. *See id.;* AR 1442–1462. The Settlement Agreement became final on July 25, 1991. *See DPSU I*, 798 F.Supp. at 765.

The Consent Order portion of the Settlement Agreement contained the following provision in Paragraph II:

that for a period of ten (10) years after the date this order becomes final, respondents shall not, without prior approval of the Commission, acquire directly or indirectly all or any part of the stock of, share capital of, equity interest in, assets of or rights relating to any Bottling Operation in any county in the New York Metropolitan Area where at the time of such acquisition any Existing Honickman Bottling Operation distributes CSDs directly using company-owned or equity distributors to supermarkets.

AR 1444. The Consent Order defined the term "Bottling Operation" as follows:

"Bottling Operation" means any business, person, or other entity that distributes and sells CSDs directly using company-owned or equity distribution to supermarkets pursuant to a franchise, license, distribution contract, or other similar agreement; provided, however, a Bottling Operation shall not include any business, person or other entity that distributes and sells CSDs only by warehouse delivery or through a beer distributor that does not hold a CSD franchise, license or similar distribution agreement.

AR 1443. Thus, according to this definition, Seven–Up Brooklyn—the assets of which were at issue in *DPSU I*—was a Bottling Operation and subject to the prior approval provisions of the Consent Order. Under the terms of Paragraph II of that Order, therefore, Mr. Honickman was required to make an application for and obtain the Commission's approval before he could proceed to reacquire Seven–Up Brooklyn's assets and franchise rights. The FTC's denial of that application constituted the agency action reviewed by the court in *DPSU I. See DPSU I*, 798 F.Supp. at 764–66.

Having been in financial difficulty for some time, New York Bottling ceased operations—including all bottling and selling of soft drinks—in October 1991. AR 6000.[6] On

---

4. The Commission approved Mr Honickman's application for the following New Jersey counties: Morris, Union, Somerset, Middlesex, Sussex, Hudson, Essex, Bergen, and Passaic. AR 6044.

5. Mr. Honickman first acquired Seven–Up Brooklyn in 1987. *See DPSU I*, 798 F.Supp. at 764. After the FTC commenced its investigation of that acquisition, but before it filed its adminis-
trative complaint, Mr. Honickman sold most of his interests in the company. *See id.* at 765.

6. The precise date on which operations ceased is unclear from the record. Mr. Honickman's Application and various Commission memoranda give October 24, 1991 as the date. *See* AR 6000, 5164, 5288. An article from *New York Newsday*, attached to Mr. Honickman's Application, indicates that New York Bottling shut its doors on

October 24, 1991, Mr. Honickman filed with the FTC a "Request For a Declaration Or in the Alternative For Approval to Obtain Certain Assets of New York Seven–Up" ("the Application"). AR 6000–6009. The Application informed the Commission that New York Bottling had ceased its operations and that Mr. Honickman wished to acquire "certain licensing rights, currently held by New York Seven–Up Bottling Company." AR 6000. The Application also sought FTC permission for Honickman to distribute Seven–Up in the former New York Bottling territory on an interim basis. AR 6001.[7]

With regard to the acquisition of these licensing rights, Mr. Honickman's Application made three arguments which are reasserted in plaintiffs' instant summary judgment motion. First, Mr. Honickman argued that the prior approval provisions of the Consent Order did not apply to the proposed transaction, which involved the acquisition of licensing rights directly from DPSU rather than from New York Bottling. AR 6003. DPSU—a concentrate manufacturer—was and is not a Bottling Operation within the meaning of Paragraph II of the Consent Order. Moreover, because New York Bottling had ceased operations entirely, DPSU planned to terminate the license of New York Bottling, thereby extinguishing its legal right to bottle and distribute Seven–Up brand products. AR 6004. In other words, according to the Application, "the transaction does not involve an acquisition of the assets of a 'Bottling Operation,' as that term is defined in the Consent Order." *Id.* Thus, Mr. Honickman asked in the first instance for a declaration that the Consent Order's prior approval provision did not apply to "a vertical assignment of a new license from the franchisor, DPSU." *Id.*

Second, Mr. Honickman argued—as he had in *DPSU I*—that the proposed acquisition would be procompetitive because economies in distribution and marketing could be achieved by linking Seven–Up brands to a large scale distribution system. AR 6005; *DPSU I*, 798 F.Supp. at 765–66. Such economies of scale were necessary to compete effectively in a major metropolitan area such as New York. AR 6005–6006. Finally, Mr. Honickman argued—again, as he had in *DPSU I*—that, even if the proposed transaction were not considered procompetitive, it would nevertheless satisfy the requirements of the "failing company defense." AR 6006; *DPSU I*, 798 F.Supp. at 766. Indeed, as the Application pointed out, New York Bottling was not merely a failing firm, but a failed firm, with no prospects for reorganizing and with Mr. Honickman as the only available and viable purchaser. AR 6007–6008.

By the time Mr. Honickman submitted the Application to the FTC, he and DPSU were involved in the Brooklyn Seven–Up litigation before Judge Revercomb. Plaintiffs attempted to wrap the New York Bottling transaction together with the Brooklyn case by seeking leave to amend their complaint, which Judge Revercomb denied by Order dated January 13, 1992. *See Dr Pepper/Seven–Up Cos. v. FTC*, Civ.A. No. 91–2712–GHR, 1992 WL 24047 (D.D.C. Jan. 13, 1992). This same Order dismissed all New York Bottling claims from the Brooklyn case on ripeness grounds, in view of the fact that the FTC had yet to rule on Mr. Honickman's October 24, 1991 Application. *Id.* The Seven–Up Brooklyn and New York Bottling cases henceforth proceeded on separate tracks.

October 21, 1991. *See* AR 6010. A memorandum in aid of FTC consideration of Mr. Honickman's Application, submitted by plaintiffs and dated June 24, 1992, gives October 18, 1991 as the date on which New York Bottling "abruptly closed its doors." AR 6514. Virtually all of plaintiffs' filings in this case refer to the October 18 date. Whatever the precise date, however, it is undisputed that Mr. Honickman's Application was filed *after* New York Bottling ceased operations.

7. On December 16, 1991, the Commission partially approved and partially denied Mr. Honickman's request for interim distribution, permitting interim distribution in the nine New Jersey counties, but not in the three New York counties. AR 6239–6246. Plaintiffs thereafter applied for emergency injunctive relief to compel the FTC to grant interim distribution in Manhattan, the Bronx, and Westchester County, which Judge Revercomb denied by Order dated December 19, 1991. *See Dr Pepper/Seven–Up Cos. v. FTC*, Civ.A. No. 91–2712–GHR, 1991 WL 315128 (D.D.C. Dec. 19, 1991).

The Commission placed the Application on the public record for comment, as is required by Section 2.41(f) of its Rules of Practice. *See* 16 C.F.R. § 2.41(f); AR 6083. Numerous public comments were submitted, *see* AR 6083–6235, including many submissions from Mr. Honickman and DPSU. AR 6134–6149, 6321–6322, 6323–6348, 6351–6478, 6508–6509, 6510–6558B, 6571–6572, 6591–6598, 6601–6604, 6606–6607, 6613–6614, 7108–7115. Mr. Honickman and representatives from DPSU also met on numerous occasions with FTC staff, *see* AR 6672–6673, 6674–6675, 6676–6679, 6680–6681, 6724–6730, 6735–6736, 6748–6749, 6750–6752, 6756–6758, 6770–6773, 6775–6826, 7451–7452, 7453–7455, and individually with each FTC Commissioner. AR 6584–6590, 6653–6662, 6663–6666.

On November 16, 1992, the Commission issued its opinion letter granting in part and denying in part Mr. Honickman's request for prior approval. AR 6044–6065. This lawsuit followed.

## ANALYSIS

The threshold issue, and the issue that most differentiates this case from *DPSU I*, is whether the prior approval provision of the Consent Order applies at all to the proposed transaction. As a preliminary matter, the FTC contends that this Court lacks jurisdiction to consider the question of Consent Order coverage. According to the Commission, the scope of the Consent Order would not be ripe for judicial review until the FTC actually sought to enforce it in a civil penalty action pursuant to 15 U.S.C. § 45(1). In support of this contention, the FTC relies heavily on *Flowers Industries v. FTC*, and two other cases. *See Flowers Industries v. FTC*, 849 F.2d 551, 553 (11th Cir.1988) (citing *Floersheim v. Engman*, 494 F.2d 949, 952 (D.C.Cir.1973); *see also Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115 (2d Cir.1975). Thus, says the Commission, Mr. Honickman would have to acquire New York Bottling's assets, await FTC enforcement of the Consent Order in a civil penalty action, and then assert non-coverage as a defense. Only then could a district court review the coverage issue. The implication of this argument is that the Court should

*assume* that coverage is proper and proceed to analyze the merits of the FTC's decision. *See* Def.'s Mem. in Supp. of Summ. J. at 17–19.

This argument would have some force were the FTC's opinion letter of November 16, 1992 merely advisory or otherwise not a final agency action under the APA. *See* 5 U.S.C. § 704. A careful reading discloses that to have been the case in each of the cases relied upon by the Commission. In *Flowers Industries*, for example, what was at issue was an FTC letter approving the sale of two bakeries to a third party under the terms of a modified consent order. *See Flowers Industries v. FTC*, 849 F.2d at 552–53. The letter in question was not self-implementing and the FTC had taken no action to enforce it at the time the plaintiff sought declaratory and injunctive relief. *See id.* at 552. *Brown & Williamson Tobacco* concerned the reviewability of FTC letters to tobacco companies stating that the Commissioners agreed with staff conclusions that the plaintiffs had violated consent orders pertaining to the Surgeon General's warning concerning the hazards of smoking and that the Commission intended to commence an action for civil penalties. *See Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d at 1117. At the time the plaintiffs filed their complaints, however, the FTC had not commenced civil penalty actions against them. *See id.* at 1117–18. Similarly, *Floersheim v. Engman* involved an FTC determination that certain "skip-tracer" forms sold by the plaintiff to creditors and debt-collection agencies did not comply with the terms of a cease-and-desist order. *See Floersheim v. Engman*, 494 F.2d at 951. Plaintiff thereupon filed suit seeking a declaration that the forms did comply and to stop the FTC from bringing a civil penalty action. *See id.* Each of these cases, in other words, involved an attempt to review an FTC determination concerning the scope of consent or cease-and-desist orders *before* the Commission undertook the agency action made reviewable under 15 U.S.C. § 45(*l*) and 5 U.S.C. § 704.

 This case is different, because the FTC determination as to the scope of the Consent Order was made in conjunction with

agency action that is most assuredly reviewable by this Court. That agency action was the FTC's decision to deny Mr. Honickman's application for prior approval made pursuant to the terms of the Consent Order and the FTC's regulations. *See* AR 6044–6065; 15 U.S.C. § 2.41(f). Prior approval provisions in FTC consent orders such as the one at bar have been held to give the Commission a veto over proposed acquisitions or divestitures. *See DPSU I,* 798 F.Supp. at 771 (citing *United States v. Louisiana–Pacific Corp.,* 569 F.Supp. 1141, 1147 (D.Or.1983); and *West Texas Transmission L.P. v. Enron Corp.,* 1989–1 Trade Cas. (CCH) ¶ 68,424, at 60,333–34, 1988 WL 156330, *9–11 (W.D.Tex.1988), *aff'd,* 907 F.2d 1554 (5th Cir.1990), *cert. den'd,* 499 U.S. 906, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991)). As both the district court and the court of appeals made clear in *DPSU I,* the FTC's exercise of that veto with respect to a prior approval application is an adjudication within the meaning of the APA, falling within "the residual category of 'informal adjudication,' to which apply the minimal procedural requirements of Section 555 of the APA," and as such is reviewable as final agency action. *DPSU I,* 798 F.Supp. at 773, 776; *DPSU I,* 991 F.2d at 862–63. A predicate for the lawful exercise of that veto power is that the prior approval provisions of the Consent Order govern the proposed transaction in the first place; if they do not govern, as plaintiffs persuasively argue, then the exercise of that veto in the denial of an application is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ Having determined that consideration of the coverage issue is now proper, the Court will turn to the interpretation of the Consent Order with regard to Mr. Honickman's proposed transaction. Our court of appeals has provided the following succinct guidance on the interpretation of consent decrees:

> "We read [a] Decree essentially as we would a contract. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236–37[, 95 S.Ct. 926, 935, 43 L.Ed.2d 148] ... (1975); *United States v. Western Elec. Co.,* 797 F.2d 1082, 1089 (D.C.Cir.1986)

> ..., *cert. denied,* 480 U.S. 922[, 107 S.Ct. 1384, 94 L.Ed.2d 698] ... (1987). Thus, while the meaning of [a] Decree's terms 'must be discerned within its four corners,' *United States v. Armour & Co.,* 402 U.S. 673, 682[, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256] ... (1971), our inquiry is guided by conventional 'aids to construction,' including 'the circumstances surrounding the formation of the consent order [and] any technical meaning words used may have had to the parties ...' *ITT Continental Baking Co.,* 420 U.S. at 238[, 95 S.Ct. at 935].…" *United States v. Western Elec. Co.,* 894 F.2d 1387, 1390 (D.C.Cir.1990).

*United States v. Western Elec. Co.,* 900 F.2d 283, 293 (D.C.Cir.1990). This principle—that a consent order should be interpreted as a contract would be—is particularly appropriate here, when the issue involves the interpretation of terms contained in the Consent Order itself, as opposed to procedural questions implicating the Consent Order but on which the Order itself is silent (as was the case in *DPSU I* ). *See DPSU I,* 798 F.Supp. at 769–70.

Plaintiffs argue that New York Bottling's cessation of all bottling and distribution activities prior to the filing of Mr. Honickman's Application with the FTC had two practical consequences that rendered the Consent Order's prior approval clause inapplicable. First, they contend that New York Bottling's shut-down in October, 1991 meant that it was no longer a "Bottling Operation" as defined in the Consent Order, because that definition limits the term "Bottling Operation" only to a "business, person, or other entity" that *presently* distributes and sells CSDs directly to supermarkets. AR 6003–6004. The term, plaintiffs argue, does not apply to entities that *formerly* distributed CSDs but ceased doing so prior to Mr. Honickman's proposed acquisition of licensing rights. AR 6584, 6592, 6593–6594, 6654–6655. Moreover, they contend, "[b]y ceasing to distribute soft drinks, New York [Bottling] breached its license agreements to distribute 7–Up and other beverages." AR 6654–6655. The Seven–Up licenses were then suspended by DPSU pursuant to a Termination Agreement dated November 9, 1991, and effectively terminated by the bankruptcy court on Novem-

ber 6, 1991. AR 6274; Pls.' Mem. at 17 n. 14.[8] Thus, although New York Bottling's Seven–Up license may have remained "vested" in the defunct firm during the pendency of Mr. Honickman's Application, the suspension of the licenses effectively terminated New York Bottling's ability legally to bottle and distribute Seven–Up. *See* Pls.' Op. at 11. In short, not only had New York Bottling ceased to be a Bottling Operation, it "had" nothing for Mr. Honickman to acquire.

Second, and following from the preceding analysis, plaintiffs contend that Mr. Honickman sought to acquire the Seven–Up licenses not from New York Bottling but directly from DPSU, the parent company. Because DPSU does not sell its products to supermarkets, it is not a Bottling Operation within the meaning of the Consent Order. They contend, moreover, that acquisition of licensing rights directly from the franchisor and owner of the Seven–Up trademark is a "vertical" transaction that is beyond the scope of the Consent Order, which applies only to "horizontal" transactions, or acquisitions by Mr. Honickman of the rights or assets of other bottlers. For these reasons, plaintiffs' argue, the Consent Order's prior approval clause simply does not apply to the direct acquisition of rights by vertical assignment.

 Although the question is a close one, the Court on balance finds plaintiffs' arguments to be persuasive for the following reasons. First, the FTC's contentions as to the breadth of the "directly or indirectly ... rights relating to" language in Paragraph II of the Consent Order are undermined by other language in the Order and by extrinsic evidence from the Order's negotiating history. While it may be true the "related to" language in Paragraph II is not limited by a verb with either a present or past tense—as in "rights that *are* related to" or "rights that *were* related to"—the term "Bottling Operation," which modifies the references to assets or rights, is unambiguously defined as an entity that presently distributes and sells CSDs to supermarkets, and does not include entities that formerly did so. The negotiat-

ing history of the Consent Order clearly shows, moreover, that FTC staff first proposed, and Mr. Honickman rejected, language requiring prior approval for the acquisition of "assets located in the New York metropolitan area used in *or previously used in (and still suitable for use in)* the soft drink products business." AR 7690–7691 (emphasis added). The language finally agreed to by Mr. Honickman and the FTC limited prior approval to the acquisition of assets or rights related to a Bottling Operation, which is defined solely in the present tense as "any business, person, or other entity that *distributes and sells* CSDs directly using company-owned or equity distribution to supermarkets pursuant to a franchise, license, distribution contract, or other similar agreement." AR 11 (emphasis added). To accept the FTC's interpretation of "rights related to," in other words, would not only contravene the plain meaning of the Consent Order but also expand that phrase to encompass meanings clearly rejected by the parties during negotiations.

The record also clearly shows that, prior to the Commission's final acceptance of the Consent Order, FTC staff members who had participated in negotiations with Mr. Honickman believed that the final language of Paragraph II did not apply to the vertical assignment of licensing rights directly from DPSU and so advised the Commission. AR 1413, 1418, 1427. Indeed, the Commission was advised by the Assistant Director of the Bureau of Competition that when FTC staff had "suggested to Honickman that we cover the vertical franchise award explicitly, he turned us down." AR 1427. FTC staff appear to have changed their view of the expansive application of the prior approval provision only after Mr. Honickman submitted the Application on October 24, 1991. AR 6892 (memorandum to the Commission from Bureau of Competition staff, dated June 15, 1992, interpreting the "rights related to" language to cover the proposed transaction). While the views of FTC staff do not necessarily reflect the understanding of Commis-

---

**8.** The record shows that New York Bottling's licenses to distribute Barq's and Crush brand soft drinks were terminated and reverted to their respective franchisors when New York Bottling closed its doors. AR 6898, 6900.

sion members themselves, the Court believes that the opinions expressed in staff memoranda prior to final acceptance of the Consent Order are probative of the parties' intent as regards the coverage issue at the time the Order was negotiated.

Finally, as was explained by Judge Revercomb in his Memorandum Opinion in *DPSU I* and as the FTC argued in that case, the parties expressly agreed that the Commission's 1989 administrative complaint against Mr. Honickman could be used to construe the terms of the Consent Order. *See DPSU I,* 798 F.Supp. at 772. Examination of that complaint shows that it was premised on the theory that Mr. Honickman's acquisition of the assets of another Bottling Operation (Seven–Up Brooklyn) would likely reduce competition by, among other things, eliminating direct competition from a competitor. AR 6 (¶ 22). The facts alleged in that complaint describe potential harm to competition from horizontal transactions. AR 0–9 (¶¶ 2–16, 21, 22). As such, it reinforces the impression given by the staff memoranda discussed above that the Consent Order as negotiated and agreed to by the parties gave the FTC a veto over future Honickman acquisitions of the assets or rights of other bottlers, such as those of Seven–Up Brooklyn, but not over vertical acquisitions of rights directly from concentrate manufacturers. The Court is convinced in this case that the more expansive interpretation of the Consent Order urged by the FTC is thus inconsistent with record evidence of the intentions of the parties and " 'the circumstances surrounding the formation of the consent order [and] any technical meaning words used may have had to the parties ...' " *United States v. Western Elec. Co.,* 900 F.2d at 293 (quoting *ITT Continental Baking Co.,* 420 U.S. at 238, 95 S.Ct. at 935).

The Court concludes, therefore, that Mr. Honickman's proposed acquisition from DPSU of a license to bottle, distribute and sell Seven–Up in parts of the territory formerly covered by the now defunct New York Bottling Company is not subject to the Consent Order he entered into with the FTC in 1991. It follows that the Commission's decision to the contrary, and its denial of prior approval of the transaction necessarily based on that decision, are arbitrary and capricious under the APA. Because the coverage question is dispositive, it is unnecessary to address the parties' arguments regarding the substantive merits of the FTC's decision or the procedures it employed in reviewing Mr. Honickman's Application.

Accordingly, the Court will this day enter an Order granting plaintiffs' Motion for Summary Judgment, denying defendant FTC's motion for summary judgment, declaring that Mr. Honickman's proposed acquisition of a new soft drink license from DPSU is not a transaction covered by or subject to the prior approval provision of the 1991 Consent Order, and enjoining the FTC from taking a position to the contrary. This Order, of course, is strictly limited to the question of Consent Order coverage and in no way affects any other actions that the FTC may deem appropriate in the lawful exercise of its discretion vis-a-vis the proposed transaction or the soft drink market in metropolitan New York.