**DR PEPPER/SEVEN–UP COMPANIES, INC., et al., Plaintiffs,**

v.

**FEDERAL TRADE COMMISSION, Defendant.**

Civ. A. No. 91–2712 (GHR).

United States District Court, District of Columbia.

July 20, 1992.

Philip D. Bartz, Leslie J. Cloutier, Micki M. Chen, Morrison & Foerster, Washington, D.C., for plaintiff Dr. Pepper/Seven–Up Companies, Inc.

Peter E. Greene, Skadden, Arps, Slate, Meagher & Flom, New York City, Gary A. MacDonald, Skadden, Arps, Slate, Meagher

**764**

& Flom, Washington, D.C., for plaintiff Harold A. Honickman.

Jeffrey T. Sprung, Asst. U.S. Atty., James M. Spears, Melvin H. Orlans, F.T.C., Washington, D.C., for defendant F.T.C.

W. Foster Wollen, Cathleen Shine, Sherman & Sterling, Washington, D.C., for intervenor Cadbury Beverages, Inc.

## MEMORANDUM AND OPINION

REVERCOMB, District Judge.

Before the Court are the cross-motions for summary judgment of plaintiffs Dr Pepper/Seven–Up Companies, Inc. ("DPSU") and Harold A. Honickman ("Honickman"), and defendant Federal Trade Commission ("FTC" or "the Commission"). At issue is whether the FTC's decision to deny Honickman's application for prior approval to acquire certain assets of the Seven–Up Brooklyn Bottling Company ("Seven–Up Brooklyn")—an application made pursuant to a Consent Order between Honickman and the FTC—is arbitrary and capricious, violates Honickman's due process rights, and violates substantive antitrust law. The disputes before the Court are largely ones of law, not of fact, and summary judgment is appropriate. Having considered the parties' briefs, oral arguments of counsel, and the extensive administrative record, the Court declines to reverse the FTC's decision and will accordingly enter an order granting summary judgment to the Commission and deny plaintiffs' motion.

## I. BACKGROUND

Honickman owns interests in and controls all voting rights of Canada Dry Bottling Company of New York and Pepsi Cola Bottling Company of New York, Inc., which are bottlers and distributors of soft drinks in New York State. AR 4.[1] DPSU is a manufacturer of soft drink concentrate, in particular of "Seven–Up," a leading soft drink brand.

Like other major concentrate manufacturers, DPSU does not distribute Seven–Up directly to consumers, but rather grants exclusive territorial marketing rights to bottlers to do so. Seven–Up Brooklyn was one such franchisee, with rights to bottle and distribute Seven–Up and other soft drinks in a portion of the lucrative New York metropolitan market.[2] DPSU and Honickman now desire that Honickman obtain Seven–Up Brooklyn's share of the New York market. The FTC believes that such an acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45.

In August 1987, Honickman acquired[3] Seven–Up Brooklyn's soft drink franchises, as well as other assets including production equipment, vending equipment, office equipment and furnishings, and real estate. AR 4. One consequence of this acquisition was that the soft drink market in three metropolitan counties—Kings, Queens and Richmond—became more highly concentrated, as the number of bottlers was reduced effectively from three to two (Honickman and Coca Cola New York). AR 1680. The acquisition prompted an FTC investigation into the transaction's likely effects on competition, from which the Commission concluded that there was reason to believe that the transaction was likely substantially to lessen competition in the production, distribution and sale of soft drinks in the New York metropolitan area in violation of Section 7 of the Clayton Act and Section 5 of the FTC Act. AR 5. The Commission accordingly issued an administrative complaint challenging Honickman's

---

1. References to the Administrative Record will be cited as "AR ——."

2. Prior to Honickman's 1987 acquisition of its franchises and other assets, Seven–Up Brooklyn's franchise territory covered five counties in the New York metropolitan area: Kings (Brooklyn), Queens, Richmond (Staten Island), Nassau and Suffolk. AR 1151. Apart from Seven–Up, Seven–Up Brooklyn also held distribution fran-

chises for A & W Root Beer, Perrier, Hawaiian Punch, Brownie, Canfields, and Lipton Tea. AR 4.

3. How Honickman acquired Seven–Up Brooklyn, and whether he sought to avoid filing premerger notification reports with the FTC as required by the Hart–Scott–Rodino Act, section 7A of the Clayton Act, 15 U.S.C. § 18A, are not issues before the Court.

acquisition and seeking divestiture of assets acquired from Seven–Up Brooklyn. AR 0–8.

Before the Commission issued its complaint, however, Honickman sold his interest in the bottling and distribution business of Seven–Up Brooklyn to Lance T. Funston, an investment banker and business associate of Honickman who had invested in the 1987 acquisition. AR 713. Honickman apparently did not sever his ties entirely, however, for he retained control over real estate acquired from Seven–Up Brooklyn, which Funston leased from him. AR 1345. Honickman's partial divestiture occurred in December 1988. AR 713. The financial fortunes of Seven–Up Brooklyn, which had been "financially troubled for many years," deteriorated further after the sale to Funston and in October 1990 the company filed for bankruptcy protection under Chapter 11. AR 714.

The FTC issued its administrative complaint on November 2, 1989. AR 0–9. Honickman elected to pursue settlement negotiations with the Commission rather than litigate. AR 713. In January 1991, Honickman and the FTC entered into an "Agreement Containing Consent Order" ("the Settlement Agreement") to settle the complaint. AR 1442–1462.[4] Pursuant to its Rules of Practice, the Commission published the Settlement Agreement in the *Federal Register* and opened a sixty-day public comment period. *See* 16 C.F.R. § 3.25(f) (1992); 56 Fed.Reg. 19,859–865 (proposed April 30, 1991). The FTC thereafter issued the Settlement Agreement on July 25, 1991. *See* 56 Fed.Reg. 38,446 (Aug. 13, 1991).

Paragraph II of the Consent Order provides

> that for a period of ten (10) years after the date of this order becomes final, respondents shall not, without prior approval of the Commission, acquire direct-

ly or indirectly all or any part of the stock of, share capital of, equity interest in, assets of or rights relating to any Bottling Operation in any county in the New York Metropolitan Area where at the time of such acquisition any Existing Honickman Bottling Operation distributes [carbonated soft drinks, or CSDs] directly using company-owned or equity distributors or supermarkets.

AR 12.[5] While the Consent Order itself is silent as to procedures and burdens of proof in evaluating applications made pursuant to Paragraph II, the Settlement Agreement, of which the Consent Order is a part, contains express waivers on the part of Honickman of "[a]ny further procedural steps," the requirement that the FTC's decision contain findings of fact and conclusions of law, all rights to seek judicial review or challenge the validity of the Consent Order and any claim under the Equal Access to Justice Act. AR 1442–1442A. The Settlement Agreement expressly provides, moreover, that "[t]he complaint may be used in construing the terms of the order, and no agreement, understanding, representation, or interpretation not contained in the order or in the agreement may be used to vary or to contradict the terms of the order." AR 1442A.

Having entered into the Settlement Agreement with the Commission, and pursuant to Section 2.41(f) of the Commission's Rules of Practice, 16 C.F.R. § 2.41(f), Honickman submitted an application for prior approval to the FTC, dated February 12, 1991, to acquire certain assets of Seven–Up Brooklyn. AR 48–57. Honickman's proposal involved, first, the acquisition by DPSU of licenses, distribution rights and vending equipment from Seven–Up Brooklyn, followed immediately by Honickman's purchase of these assets from DPSU. AR 49. Honickman argued that his acquisition

---

**4.** The Settlement Agreement also included the Consent Order, an Agreement to Hold Separate, and an Addendum permitting Honickman to distribute on an interim basis the carbonated soft drinks formerly bottled and distributed by Seven–Up Brooklyn.

**5.** In the alternative, the Consent Order provides that Honickman need not obtain prior Commission approval if he satisfies certain hold-separate requirements set forth in the Order and an attached Agreement to Hold Separate and divests the overlapping bottling operations that he already owns. AR 12–14, 19–27.

of these assets would be procompetitive because it would enable him to achieve economies of scale in the marketing and distribution of Seven–Up brands necessary to compete effectively in the metropolitan New York market. AR 52–53. In the alternative, Honickman argued that the acquisition met the requirements of the "failing firm defense." AR 53–56.

While the FTC reviewed the Settlement Agreement and Honickman's application, proceedings involving Seven–Up Brooklyn continued before the bankruptcy court. On January 28, 1991, Seven–Up Brooklyn filed an application for an order setting a hearing date to consider sale of the company's assets, which included a draft agreement according to which Seven–Up Brooklyn's assets would be sold to a division of DPSU, which would in turn sell them to Honickman. AR 58–77.

The bankruptcy judge held a hearing on Seven–Up Brooklyn's application on February 27, 1991. AR 261. At this hearing, there were two bidders for the company's assets: DPSU/Honickman and Kraus Industries. The Kraus proposal would have kept Seven–Up Brooklyn operating as a bottler of soft drinks in New York, but did not at first provide sufficient funds to satisfy the company's obligations to its junior secured lender and the franchisors, all of whom refused to consent to a reduction in their amounts. AR 333, 340–341, 559. The DPSU/Honickman proposal did not envision the continued operation of Seven–Up Brooklyn as a distinct entity and was conditioned on FTC approval. AR 270, 559. This proposal, however, did provide more cash up front and had the support of the debtor, the two secured creditors, the unsecured creditors committee, DPSU and some other franchisors. AR 559.

Nevertheless, the bankruptcy judge rejected both proposals and terminated Seven–Up Brooklyn's authority to use the cash collateral advanced by its secured lenders. *Id.* The judge gave as reasons for rejecting the DPSU/Honickman proposal her concerns that DPSU and Honickman had taken positions that either dissuaded other prospective bidders or shut off competitive

bidding for the assets of Seven–Up Brooklyn and that the FTC might not approve a transaction that it had previously believed to be anticompetitive. AR 418–421, 559. DPSU made it clear to the court that it would require any other buyer than Honickman to pay DPSU $1.4 million to cover Seven–Up Brooklyn's debt to DPSU for Seven–Up concentrate and to compensate DPSU for the Seven–Up Brooklyn's failure to promote the brand during the bankruptcy period. AR 293, 324–325, 329, 415–416. It was also apparent to the bankruptcy judge that any other bidder than Honickman would face a potential lawsuit from DPSU. AR 325.

Notwithstanding these concerns, however, the bankruptcy judge reversed herself and approved the DPSU/Honickman bid after a second hearing on March 5, 1991. At that hearing, DPSU/Honickman resubmitted their previous proposal. AR 560–561. Kraus submitted a revised proposal, which was again rejected by the debtor, the secured and unsecured creditors, and some of the franchisors. *Id.* The bankruptcy judge found the revised Kraus proposal inadequate and it was withdrawn. AR 561. The court then awarded Seven–Up Brooklyn to DPSU/Honickman. AR 562.

These bankruptcy proceedings formed part of the context within which the FTC considered Honickman's application for prior approval. Pursuant to Section 2.41(f) of the Commission's Rules of Practice, the application was placed on the public record for a thirty-day period beginning May 13, 1991. AR 37–38. In response, the Commission received numerous public comments from interested parties stating their views of the transaction. AR 737–1030. These included a comment from PepsiCo, the manufacturer of concentrate for Pepsi brand soft drinks, expressing concern over the application because it would "harm PepsiCo (by causing Honickman to drop PepsiCo's lemon-lime Slice brand in the New York City area)," and because "[f]or a significant soft drink bottler to acquire another such bottler in the same local area would be inconsistent with past and ongoing Commission enforcement proceedings, including several against PepsiCo." AR

737. The Commission also received comments from numerous equity distributors who had handled the actual route distribution of Seven–Up for Seven–Up Brooklyn in opposition to the application. *See, e.g.,* AR 745–747, 748–750, 751–754, 756, 758–759, 760–761, 762, 763, 764–765, 766, 767, 768, 769–770, 773–774, 782. On Honickman's behalf, the FTC received comments from his senator, his Congressional representative, and the Official Committee of Unsecured Creditors in the bankruptcy proceeding. AR 720–721, 1000–1003, 1008–1010.

The administrative record also shows that Honickman and DPSU availed themselves of numerous opportunities to elaborate upon the arguments advanced in Honickman's written application. AR 567, 712, 725–726. Honickman, appearing with his attorney, gave sworn testimony to FTC staff at a routine *ex parte* investigational hearing held on May 30, 1991, before an FTC presiding officer, at which time Honickman was afforded an opportunity to make a statement. AR 1478–1542.[6] In response to staff inquiries at this hearing, Honickman and his attorneys provided details about the acquisition proposal approved by the bankruptcy judge and its consequences for the distribution of other soft drink brands in the metropolitan New York market. *Id.* To meet Commission staff concerns that Honickman was the only viable purchaser of Seven–Up Brooklyn, DPSU retained a broker of soft drink franchises and licenses, Robert T. Shircliff and Associates, Inc. ("Shircliff"), to find other potential buyers. AR 569. The Shircliff report, dated June 10, 1991, indicated that the broker had identified twenty-three prospects for acquisition, but had been "unable to produce a viable, acceptable candidate for consideration." AR 575, 592–593. DPSU provided a copy of this report to the Commission. AR 569. Representatives of DPSU and Honickman, as well as Honickman himself, also met personally with Commissioner Deborah K. Owen and Commission staff on July 24, 1991. AR 722. At this meeting, Honickman, his attorney and DPSU representatives again argued that Honickman's acquisition of Seven–Up Brooklyn assets would be procompetitive and, further, that Seven–Up Brooklyn was a failing firm. AR 722–724.

The record further indicates that the Commission received detailed memoranda from FTC staff in the Bureau of Economics and the Bureau of Competition, analyzing the application and the options open to the Commission, and recommending various courses of action. These recommendations included denial of the application (AR 1645–1691, 1702–1710, 1786–1790), acceptance of the application (AR 1714–1718), and mooting the application by rejecting the Settlement Agreement altogether and instead amending the complaint to challenge Honickman's 1984 acquisition of the Pepsi franchise in New York (AR 1711–1712).

On October 3, 1991, the FTC denied Honickman's application for approval to acquire assets of Seven–Up Brooklyn. AR 232–235. The letter to counsel explaining the Commission's decision summarized the allegations of anticompetitive conduct contained in the administrative complaint and then explained the standard to which it held an applicant seeking prior approval:

> The applicant in any prior approval petition must demonstrate that the proposed acquisition is not likely to lessen competition substantially or tend to create a monopoly—in the relevant product or geographic markets—in violation of Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act. The applicant must also demonstrate that the acquisition would not otherwise conflict with the remedial purposes of the Order.

AR 233 (citations omitted).

The letter stated that Honickman's application "does not make an adequate showing" that the proposed acquisition would be procompetitive and that it satisfied the requirements of the failing firm defense. *Id.* With regard to the procompetitiveness claim, the letter stated that "an acquisition that may lower costs [of distribution] is not necessarily procompetitive or lawful if it results in an increased likelihood of higher

---

6. The transcript indicates that Honickman's attorney declined the offer. AR 1485.

prices. The fact that the firm to be acquired in a transaction is a weaker competitor than the acquirer does not alone provide any basis for concluding that the transaction is necessarily lawful." *Id.* The letter went on to state that the application "does not address the various anticompetitive effects that the Commission anticipated and charged in its complaint ... which the consent order is expressly designed to prevent." AR 234. The FTC rejected the assertion of the failing firm defense because the Commission "has no adequate basis to determine whether Honickman is the sole plausible acquirer," as the application asserted. The letter specifically cited "Honickman's past and current role as the operator of Seven–Up Brooklyn and as a major source of financial guarantees for loans securing Seven–Up Brooklyn's original purchase by Honickman and later partial resale to an entity controlled by Lance Funston" and Honickman's participation in the bankruptcy proceedings, as reasons for finding that there had been an inadequate showing that there were no alternative purchasers for Seven–Up Brooklyn. *Id.*

The Commission also found that approval of Honickman's application would conflict with the remedial purpose of the Consent Order. AR 233. The letter stated that the Consent Order "is intended to remedy the anticompetitive effects detailed in the complaint. Permitting the same acquisition that in its earlier incarceration led the Commission to allege those same anticompetitive effects is likely—if not virtually certain—to conflict with that objective." AR 234–235.

Finally, the Commission maintained that, even if it approved the application, the proposed transaction contemplated that Honickman would transfer license and franchise rights to Seven–Up and Hawaiian Punch in Nassau and Suffolk Counties to the Long Island Pepsi distributor. AR 235. Such an arrangement would eliminate a competitor and raise the same competitive concerns in those counties that had motivated the Commission's complaint against Honickman in the first place. *Id.*

## II. DISCUSSION

The motions now before the Court are addressed to Count I of plaintiffs' Second Amended Complaint.[7] Plaintiffs therein seek judicial review under the Administrative Procedure Act[8] of the FTC's denial of Honickman's application to acquire the Seven–Up Brooklyn assets discussed above. Thus, the ultimate question for the Court will be whether that denial was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Before that question can be addressed, however, the Court must consider a number of challenges raised by plaintiffs to the procedures employed by the Commission in evaluating Honickman's application.

### A. *Procedural Issues*

Plaintiffs challenge the Commission's prior approval procedures in four respects. First, they contend that the FTC improperly placed on Honickman the burden of demonstrating in his application that the proposed acquisition of Seven–Up Brooklyn would not violate Section 7 of the Clayton Act, or that such an acquisition would oth-

7. By Order dated January 13, 1992, this Court granted in part and denied in part plaintiffs' Motion for Leave to Amend Their Complaint, and granted the FTC's Motion to Dismiss Count II. Plaintiffs amended their complaint to add a Count II which sought judicial review of FTC proceedings on Honickman's application to acquire licensing rights formerly held by the now-defunct New York Seven–Up Bottling Company pertaining to the distribution of carbonated soft drinks in New York, Bronx and Westchester counties. Because the FTC had yet to render a final decision granting or denying Honickman's application, the Court viewed the matter as un-

ripe for judicial review and accordingly denied leave to amend to add this issue as part of Count II. Plaintiffs also sought judicial review of an FTC decision to deny Honickman interim distribution pending final agency action on his application vis-a-vis New York Seven–Up. This decision the Court held was reviewable agency action, and gave leave to add Count II to that extent. The Court subsequently denied plaintiffs' petition for injunctive relief with respect to the FTC's denial of interim distribution.

8. 5 U.S.C. § 706(2)(A).

erwise meet the requirements of the failing firm defense. Second, plaintiffs contend that the FTC's reading of the Consent Order in light of remedial purposes discerned from the administrative complaint should be rejected as an *ex post facto* attempt to add material terms to the Order that had not been bargained for. Third, plaintiffs maintain that the Commission improperly denied Honickman a trial-type on-the-record hearing on his application as required under the FTC Act and the Commission's Rules of Practice. Fourth, plaintiffs assert that, even if the Consent Order and the Rules of Practice permitted the denial of a full-blown hearing, the Due Process Clause of the Fifth Amendment did not.

The first three of these objections rest largely on the assumption that the Consent Order defines the extent to which the FTC can depart from its usual adjudicatory proceedings in reviewing an application for prior approval. Thus, for example, plaintiffs contend that the FTC had no discretion to deny Honickman an adjudicatory hearing on the record or to place on him the burden of proof because the Consent Order lacked provisions addressing those issues. In effect, plaintiffs argue that the Consent Order must be read as a private contract, in which the FTC is bound by its bargain and which the Court can interpret *de novo*. There is, to be sure, well-settled authority for reading a consent decree as one would a contract, discerning the meaning of the terms of the decree within its four corners and in light of "conventional 'aids to construction.'" *United States v. Western Elec. Co.*, 894 F.2d 1387, 1390 (D.C.Cir.1990) (quoting *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975)). Such a reading would seem most appropriate when the dispute concerns the interpretation or construction of express terms contained in a court-approved consent decree, as was the situation in the cases upon which plaintiffs chiefly rely.

*See United States v. Armour & Co.*, 402 U.S. 673, 675, 91 S.Ct. 1752, 1754, 29 L.Ed.2d 256 (1971); *Hughes v. United States*, 342 U.S. 353, 355–56, 72 S.Ct. 306, 307–08, 96 L.Ed. 394 (1952); *Western Elec. Co.*, 894 F.2d at 1389; *Sealy Mattress Co. of Michigan v. Sealy, Inc.*, 789 F.2d 582, 585 (7th Cir.1986).

This principle may give way, however, when the settlement agreement concerns matters within an agency's "statutory field of administration." *MCI Telecommunications Corp. v. F.C.C.*, 822 F.2d 80, 84 (D.C.Cir.1987). The court of appeals for this circuit has repeatedly endorsed the view that, in such circumstances, an agency's interpretation of a settlement agreement negotiated by agency staff and subject to agency approval is entitled to judicial deference for reasons akin to those set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See, e.g., Cajun Elec. Power Coop., Inc. v. Federal Energy Regulatory Comm'n*, 924 F.2d 1132, 1135 (D.C.Cir.1991); *National Fuel Gas Supply Corp. v. F.E.R.C.*, 811 F.2d 1563, 1568–73 (D.C.Cir.) (Bork, J.), *cert. denied*, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). As our court of appeals recently explained:

> Any agreement that must be filed and approved by an agency loses its status as a strictly private contract and takes on a public interest gloss.... That means that when the agency reconciles ambiguity in such a contract it is expected to do so by drawing upon its view of the public interest. And, therefore, the agency to which Congress entrusted the protection and discharge of the public interest is entitled to just as much benefit of the doubt in interpreting such an agreement as it would in interpreting its own orders, ..., its regulations, ..., or its authorizing statute.

*Cajun Elec. Power Coop.*, 924 F.2d at 1135 (citations omitted).[9] The FTC's obligation

---

9. That the agency commissioners in these cases were not, strictly speaking, parties to the settlement agreements does not render the principle of deference inapplicable to the case at bar. As Judge Bork pointed out in his opinion for the court in *National Fuel Gas Supply,* an agency and its staff are not a monolith for all purposes, and even an agreement to which the staff is a party "does not make the Commission itself an

to act in furtherance of the public interest, moreover, has been held to warrant the removal of its consent order procedures from analysis under common law contract principles in other circumstances. *See Johnson Products Co. v. FTC*, 549 F.2d 35, 38 (7th Cir.1977) (holding that contract law of offer and acceptance did not apply in determining whether a private party could unilaterally withdraw from a consent order prior to its acceptance by the Commission); *Ford Motor Co. v. F.T.C.*, 547 F.2d 954, 956–57 (6th Cir.1976) (deferring to the Commission's reasonable interpretation of its regulations on the same issue), *cert. denied*, 431 U.S. 915, 97 S.Ct. 2176, 53 L.Ed.2d 225 (1977).

The Consent Order in the case at bar is silent on the procedural issues that plaintiffs now contest. The prior approval clause of Paragraph II contains no words saying *how* approval is to be sought, granted or denied. But the Consent Order does not exist in a vacuum. It is itself part of a larger settlement agreement—the Agreement Containing Consent Order—which Honickman and FTC staff signed. AR 1442–1451. It appears to the Court, and plaintiffs do not contradict, that Commission staff negotiated and executed this Settlement Agreement pursuant to and in conformity with FTC regulations. *See* 16 C.F.R. §§ 2.31(b), 3.25(b)–(f). The regulations empower Commission staff to enter into settlement agreements even after the issuance of an administrative complaint, thereby removing the matter from formal adjudication. *See* 16 C.F.R. §§ 2.31(b), 3.25(a)–(e). The regulations further prescribe the form and much of the content of settlement agreements. *See* 16 C.F.R. § 2.32. They require, moreover, that settlement agreements executed by Commission staff be considered by the Commission itself, which has discretion to accept or reject the agreement in whole or in part. *See* 16 C.F.R. §§ 3.25(b), 3.25(f). Finally, the regulations set forth the procedures to be followed in reviewing applications for approval of proposed acquisitions under

consent orders finally accepted by the Commission. *See* 16 C.F.R. § 2.41(f).

Prior approval clauses in FTC consent orders are thus extensively entwined with the Commission's regulations. Congress gave the FTC broad discretion to prevent or remedy violations of antitrust laws. *See* 15 U.S.C. §§ 21(b), 45(b); *West Texas Transmission, L.P. v. Enron Corp.*, 1989–1 Trade Cas. (CCH) ¶ 68,424, at 60,333, 1988 WL 156330 (W.D.Tex.1988), *aff'd*, 907 F.2d 1554 (5th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991). Included in that delegation is the power to make rules and regulations to carry out the Commission's statutory mandate. *See* 15 U.S.C. § 46(g). The FTC's interpretation of the statutes it administers is thus entitled to deference, *see Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782, as is its interpretation of its own regulations. *See Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965); *Cajun Elec. Power Coop.*, 924 F.2d at 1135–36. The Court thus believes that deference to the FTC's interpretation of the prior approval clause in the Consent Order is warranted when the issue is not the construction of ambiguous terms in the Order itself, but rather Commission practices and procedures implicating its regulations and on which the Order is silent.

With these principles in mind, the Court will now turn to the specific procedural objections raised by plaintiffs.

### 1. Burden of Proof

■ Plaintiffs contend that the Consent Order contains "no language suggesting a departure from normal administrative antitrust standards," Pls.' Reply at 6, and that "normal standards and procedures must govern" a prior approval proceeding. *Id.* at 4. They would limit the FTC's rights under the prior approval clause to notice that Honickman intended to acquire a bottling operation in New York and to the power to delay the merger without having to seek a court-ordered preliminary injunction. Pls.' Mem. in Supp. of Mot. for

interested party to the settlement contract." 811     F.2d at 1572.

Summ. J. at 49.[10] From this they conclude that the Commission improperly placed on Honickman the burden of demonstrating that his proposed acquisition of Seven–Up Brooklyn would not violate the Clayton Act, because in a normal Section 7 case the government has the burden of persuasion on the ultimate issue. *See United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982–83 (D.C.Cir.1990).

This argument would have some force if Honickman's acquisition of Seven–Up Brooklyn were still the subject of formal administrative litigation. But it is not. The Commission's Rules of Practice provide that when a consent agreement is executed by appropriate Commission staff following the issuance of an administrative complaint, those matters contained in the proposed agreement are withdrawn from formal adjudicative proceedings. *See* 16 C.F.R. § 3.25(c). The proposed settlement agreement is then treated as a nonadjudicative matter, subject to the "Nonadjudicative Procedures" outlined in Part 2 of the Rules. *See* 16 C.F.R. §§ 2.1–2.51(d). Those procedures include the informal proceedings applicable to *"[a]ll* applications for approval of proposed divestitures, acquisitions, or similar transactions subject to Commission review under outstanding orders."* 16 C.F.R. § 2.41(f) (emphasis added).

Thus, to speak of "burdens of proof" on substantive issues of antitrust law, as though a trial-type proceeding were still taking place, is beside the point. When Honickman and Commission staff agreed on a settlement of the case, the matters contained in that agreement became "nonadjudicative" by operation of the Commission's regulations. 16 C.F.R. § 3.25(e). Far from having to "prove" a Section 7 case against Honickman once he gave the Commission notice of his proposal to acquire Seven–Up Brooklyn, the prior approval provision of the Consent Order gave the FTC a veto over the transaction. Such a conclusion is consistent with the language of Rule of Practice 2.41(f), which speaks of *"applications* for approval of proposed ... acquisitions," with Honickman being the applicant in this instance. 16 C.F.R. § 2.41(f). It is consistent with the mandatory language of Paragraph II of the Consent Order: "respondents *shall not,* without the *prior* approval of the Commission," acquire the assets of any bottling operation for a period of ten years. AR 12. And it is consistent with judicial interpretations of similar prior approval provisions in FTC consent orders, which have been held to give the Commission a veto over proposed acquisitions or divestitures. *See, e.g., United States v. Louisiana–Pacific Corp.*, 569 F.Supp. 1141, 1147 (D.Or.1983); *West Texas Transmission,* 1989–1 Trade Cas. ¶ 68,424, at 60,333–334, 1988 WL 156330.

Requiring an applicant to demonstrate that a proposed acquisition would not violate Section 7 of the Clayton Act is, moreover, consistent with prior FTC practice. *See, e.g.,* Letter from Secretary Donald S. Clark to James R. Loftis in *Great Lakes Chem. Corp.,* Docket No. 9155 (Public Version) (Sept. 4, 1991); Letter from Acting Secretary Phyllis A. Johnson to G. Anthony Campbell in *Flowers Indus., Inc.,* Docket No. 9148 (Mar. 31, 1988). The cases cited by plaintiffs do not stand for the contrary. Rather, they simply indicate that, in *reviewing* petitions for prior approval, the FTC will follow applicable merger law and that "[t]he Commission is not free to deny prior approval where it has *no* reason to believe that the acquisition in question would be illegal." *In re American Medical Int'l,* 104 F.T.C. 1, 236 (1984) (Bailey, Comm'r, concurring in part and dissenting in part) (emphasis added); *In re Broadway–Hale Stores, Inc.,* 75 F.T.C. 374, 377 (1969). Neither *American Medical* nor *Broadway–Hale* supports plaintiffs' view

**10.** Plaintiffs further assert that, without the prior approval provision, the FTC might not otherwise have been entitled to notice of the proposed acquisition. Pls.' Mem. in Supp. of Mot. for Summ. J. at 49. This argument ignores the likely applicability of the Hart–Scott–Rodino ("HSR") Act, 15 U.S.C. § 18a, with its premerger notification and waiting requirements, to Honickman's acquisition of Brooklyn Bottling. *See* 15 U.S.C. §§ 18a(a)(2)(A), 18a(b). Assuming that these provisions applied, it would make little sense for the FTC to bargain in a settlement agreement for things to which it was already entitled by Act of Congress.

that the FTC bears a *burden of proof* in establishing the likely illegality of a proposed acquisition made pursuant to a consent order, as it otherwise would in formal administrative litigation.

■ Consistent agency practice is entitled to due deference from a reviewing court, as is an agency's interpretation of its own regulations. *See Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 517 n. 13, 101 S.Ct. 1895, 1903 n. 13, 68 L.Ed.2d 402 (1981); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965). Thus, considered in light of FTC prior practice and its own regulations, the Court believes it was reasonable for the Commission to require Honickman, in applying for prior approval, to demonstrate that the proposed acquisition of Seven–Up Brooklyn met the relevant criteria under Section 7 of the Clayton Act.

### 2. Remedial Purposes of the Consent Order

Plaintiffs make a related argument challenging the FTC's contention that the Commission could also reject Honickman's application because it failed to show that the proposed acquisition was compatible with the remedial purposes of the Consent Order as defined by the administrative complaint. *Compare* Def.'s Mem. in Op. to Mot. for Summ. J. at 4 *with* Pls.' Reply at 7. Analogizing the Consent Order to a private contract which must be interpreted within its four corners, plaintiffs argue that such use of the complaint amounts to the impermissible addition of material terms "under the rubric of 'remedial purposes.'" Pls.' Reply at 7. Relying on *Hughes v. United States,* 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952), plaintiffs maintain that "remedial purposes" may not be invoked to expand the consideration bargained for and explicitly set out in the Consent Order. *See id.* at 8–10.

■ Plaintiffs' reliance on *Hughes,* however, is misplaced. Unlike the consent order at issue in that case, the Settlement Agreement approved by the FTC in the case at bar expressly states that "[t]he complaint may be used in construing the

terms of the [consent] order." AR 1442A. The use of a complaint as an aid to the construction of a consent order is entirely proper when the parties have so agreed. *See ITT Continental Baking Co.,* 420 U.S. at 238, 95 S.Ct. at 935; *United States v. Reader's Digest Ass'n, Inc.,* 662 F.2d 955, 961 (3d Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982). Paragraph II of the Consent Order is phrased in terms of a *prohibition* ("respondents *shall not ...*") on the acquisition of bottling operations without first obtaining the Commission's "approval." AR 12, 1444 (emphasis added). In interpreting the relationship between the term "approval" and the language of prohibition—*i.e.,* the circumstances in which the FTC would lift the bar on the acquisition of bottling operations to which Honickman agreed—the Commission could consider the complaint, which set forth the anticompetitive effects of the acquisition that the FTC sought to avoid. AR 6. Interpreting the Consent Order in light of its remedial purposes thus entailed the construction of the Order's terms, rather than the addition of terms not previously bargained for, and involved no change in consideration as plaintiffs contend. It was, therefore, within the FTC's discretion to review Honickman's application for prior approval in light of the remedial purposes of the Consent Order, as other courts have held in similar cases. *See West Texas Transmission,* 1989–1 Trade Cas. ¶ 68,424, at 60,334, 1988 WL 156330; *Louisiana–Pacific Corp.,* 569 F.Supp. at 1142–43, 1147.

### 3. Honickman's Entitlement to an On-the-Record Hearing

Plaintiffs claim that the FTC violated Section 554(a) of the APA when it considered and denied Honickman's application for prior approval without giving him a trial-type, on-the-record hearing as required by the FTC Act and the Commission's own regulations. *See* 15 U.S.C. §§ 21(b), 45(b); 16 C.F.R. §§ 3.41(c), 4.7. Plaintiffs adduce two reasons in support of this claim. First, plaintiffs contend that the consideration and denial of the application constituted

agency adjudication, thereby triggering the full panoply of trial-type procedures set forth in the Commission's "Rules of Practice for Adjudicative Proceedings," 16 C.F.R. § 3.2 *et seq. See* Pls.' Mem. in Supp. of Mot. for Summ. J. at 46–47. Second, plaintiffs contend that the Consent Order did not alter the normal statutory requirements for an on-the-record hearing because the Order contained no provision for doing so. *See id.* at 49–50; Pls.' Supplemental Mem. on Procedural Issues at 5–8. Thus, suggest plaintiffs, the FTC is limited to the procedural benefits of its bargain as set forth within the four corners of the Consent Order.

■ Neither of these reasons is persuasive. While the review of Honickman's application for prior approval was adjudicatory in nature, *see United States v. Florida E.C. Ry. Co.,* 410 U.S. 224, 244–45, 93 S.Ct. 810, 820–21, 35 L.Ed.2d 223 (1973), that fact did not automatically entitle him to a formal on-the-record hearing. Under both the APA and the Commission's Rules, such hearings must be held on matters "required *by statute* to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a) (emphasis added); 16 C.F.R. § 3.2 (emphasis added). Nothing in the relevant statutes—15 U.S.C. §§ 21(b) and 45(b)—requires the FTC to hold an on-the-record hearing when considering an application made pursuant to an outstanding consent order.[11] In this respect, consideration of an application for prior approval is like consideration of a request to reopen an adjudicative proceeding, which our court of appeals has held does not implicate the formal hearing requirements of the APA. *See RSR Corp. v. F.T.C.,* 656 F.2d 718, 723 (D.C.Cir.1981).

Nor did the application present "a new antitrust case that the FTC had never previously considered," triggering the commencement of formal adjudicative proceedings under the Commission's Rules. Pls.' Supplemental Mem. on Procedural Issues

at 5. Rather, as should be clear from the discussion above, the application was a requirement of the Consent Order, which was in turn part of the settlement of the FTC's 1989 case against Honickman. Precisely *because* that case was settled, it was withdrawn from formal adjudication under the Rules of Practice, *see* 16 C.F.R. 3.25(c)–(e), and the terms of the Consent Order henceforth became enforceable as a final order. *See West Texas Transmission,* 1989–1 Trade Cas. ¶ 68,424, at 60,334, 1988 WL 156330 ("FTC consent orders are as valid and enforceable as any order entered after litigation," citing *ITT Continental Baking,* 420 U.S. 223, 95 S.Ct. 926). Thus, the FTC properly considered Honickman's application not as a new antitrust case, but as a compliance matter arising out of the resolution of the 1989 case.

In short, there was no statutory requirement that the FTC provide Honickman with a formal on-the-record hearing when it considered his application for prior approval. This is not to say, as plaintiffs suggest the FTC contends, that "the Consent Order gives [the Commission] complete discretion on the procedures it must use to evaluate a prior approval request." Pls.' Reply at 17. Rather, as defendant points out, consideration of the application fell procedurally within the residual category of "informal adjudication," to which apply the minimal procedural requirements of Section 555 of the APA. *See Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 655, 110 S.Ct. 2668, 2680, 110 L.Ed.2d 579 (1990); *Camp v. Pitts,* 411 U.S. 138, 140–41, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973). As mentioned previously, applications made pursuant to outstanding consent orders are entitled to the informal, summary procedures set forth in Rule of Practice 2.41(f), which include a thirty-day public notice and comment period for the application and all nonconfidential material submitted in support thereof. *See* 16 C.F.R. § 2.41(f). Moreover, Honickman was entitled to appear in person before the FTC[12] and to

---

**11.** In contrast, these statutes do require the Commission to hold formal hearings when the FTC issues a complaint in the first instance. *See* 15 U.S.C. §§ 21(b), 45(b).

**12.** Which he did. *See* AR 1479 *et seq.*

receive prompt notice of the denial of his application accompanied by a brief statement explaining the basis for the denial. *See* 5 U.S.C. § 555(b), (e); AR 232–235. The Court, therefore, discerns no violation of the APA in not providing Honickman with an on-the-record hearing in these circumstances.

Plaintiffs' other contention here—that Honickman was entitled to an on-the-record hearing because the *Consent Order* did not change the normal statutory requirements of a Section 7 case—is but a variation of their arguments on burdens of proof and remedial purposes. Strictly as a matter of contract interpretation, this contention hoists Honickman with his own petard if the Settlement Agreement is considered as a whole, for in that Agreement Honickman *agreed* to waive "*[a]ny further procedural steps.*" AR 1442–1442A (emphasis added). Setting this waiver aside, however, the Court believes that the FTC's regulations may properly be used to fill procedural gaps left in the Consent Order concerning the administration of the prior approval clause. Thus, while the Consent Order is silent on the procedures the FTC would employ in considering a request for prior approval made pursuant to Paragraph II of the Order, the Commission's regulations, discussed above, are not. *See* 16 C.F.R. §§ 2.41(f), 3.25.

### 4. Honickman's Due Process Claim

■ Finally, plaintiffs argue that, even if the FTC did not violate the APA in not conducting an on-the-record adjudicative proceeding when it considered Honickman's application for prior approval, its failure to provide him with a hearing violated the Due Process Clause. Plaintiffs contend that Honickman was entitled to a formal hearing on his application because he has a protectable interest in contracting with DPSU. *See* Pls.' Supplemental Mem. on Procedural Issues at 51. Plaintiffs further argue that Honickman and DPSU were deprived of their due process rights by the *ex parte* contacts between FTC staff and the Commission, through which staff supposedly communicated "facts" which were unknown to plaintiffs and which plaintiffs therefore were unable to rebut. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. at 49–52. Plaintiffs assert that many of these "facts" presented on an *ex parte* basis were erroneous and that due process requires that plaintiffs be given an opportunity in a hearing to set the record straight. *See id.* at 52–54.

"The Supreme Court has stated that individuals asserting a constitutional right to certain procedures must demonstrate that they have been deprived of a protected liberty or property interest." *Tarpeh–Doe v. United States*, 904 F.2d 719, 722 (D.C.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991); *see also Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972) ("[T]o determine whether due process requirements apply in the first place, we must look not to the "weight" but to the *nature* of the interest at stake"). The protected interest claimed by plaintiffs is the liberty interest in the right to contract as defined in *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).[13]

---

13. The specific passage on which plaintiffs rely reads as follows:

> While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men....

*Meyer*, 262 U.S. at 399, 43 S.Ct. at 626 (citations omitted). The right to contract, of course, was not itself at issue in *Meyer*. And while the Supreme Court continues to refer to the passage above for the general proposition that the liberty interests protected by the Constitution extend beyond mere freedom from bodily restraint, *see, e.g., Roth*, 408 U.S. at 572, 92 S.Ct. at 2706 (quoting the passage), the *Meyer* Court's inclusion of the right to contract as a liberty interest apparently rested on a line of cases, applying substantive due process analysis to contract rights, which the Court subsequently abandoned

As a threshold matter, it can be argued—as the Commission does—that plaintiffs' "right to contract" with each other is no more than "a mere expectancy grounded in 'an abstract need or desire' [which] is insufficient to trigger the protections of the due process clause." *Tarpeh–Doe*, 904 F.2d at 722 (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709). Under the terms of the Consent Order, Honickman relinquished for ten years any "right" he may have had to acquire other bottlers' franchises in the New York area absent Commission approval. Thus, on this analysis, which the Court finds persuasive, plaintiffs have failed to demonstrate that their desire to contract with one another rises to the level of a protectable liberty interest.

Of course, even if this Court were to accept plaintiffs' characterization of their interest as a protectable one under the Fifth Amendment, it does not necessarily follow that the FTC's deprivation of that interest denied them due process of law. To determine what process is "due," this Court must balance 1) the private interest affected by the FTC's action, 2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of addition or substitute procedural safeguards," and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *see also Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (applying the three *Mathews* factors in a case involving liberty interests).

While the private interest implicated here—the right to enter into contracts—is a liberty interest protected by the Constitution, the Supreme Court has long held that "[t]he Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases." *Nebbia v. New York*, 291 U.S. 502, 527–28, 54 S.Ct. 505, 512, 78 L.Ed. 940 (1934). The right of businesses to contract with each other has long been subject to reasonable statutory restrictions such as those imposed by Section 7 of the Clayton Act. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391–92, 57 S.Ct. 578, 581–82, 81 L.Ed. 703 (1937).

The Court is satisfied that there was little risk of an erroneous deprivation of this interest under the procedures employed by the Commission in reviewing Honickman's prior approval application, notwithstanding plaintiffs' arguments to the contrary. Where the FTC is engaged in informal proceedings, such as the administration of a remedial order, *ex parte* contacts between the Commission and FTC staff are not improper when they do not involve " 'off-the-record communications between members of the agency and interested outside parties.' " *RSR Corp.*, 656 F.2d at 724 (quoting *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1214 (D.C.Cir.1980), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981)).

Nor does the lack of opportunity for plaintiffs to rebut supposedly false representations or misstatements of fact made to the Commission by its staff automatically mean that the Commission's procedures were constitutionally infirm. Plaintiffs' argument to the contrary appears to be based—like their other procedural complaints—on the assumption that Honickman and the FTC became engaged in a formal, adversarial proceeding once he notified the Commission that he wished to acquire Seven–Up Brooklyn. That assumption, as has been explained, is belied both

in *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), and *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). *See Meyer*, 262 U.S. at 399, 43 S.Ct. at 626 (citing, *e.g.*, *Adkins v. Children's Hospital*, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923); *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); and *Allgeyer v.*

*Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897)). Thus, the mere inclusion of the right to contract in *Meyer*'s catalogue of liberty interests protected by the Constitution tells us nothing about the weight to be accorded that right against "governmental regulation for the public welfare." *Nebbia*, 291 U.S. at 525, 54 S.Ct. at 510.

by Honickman's agreement to be bound by the terms of the Settlement Agreement and the Consent Order and by the FTC's regulations. To require the FTC to hold a formal hearing for the purpose of allowing plaintiffs to rebut "erroneous" evidence would undermine the very procedural informality the parties bargained for and impose costs on the agency in enforcing an outstanding order out of proportion to any enhanced protection of an interest that plaintiffs had already voluntarily placed within the scope of that order.

Plaintiffs' objection on this score might carry more weight with the Court had the record disclosed that the FTC *only* considered Honickman's February 12, 1991, application for prior approval. AR 48–57. The record shows, however, that Honickman and DPSU were accorded, and availed themselves of, many opportunities to argue their case and present supporting documentation to Commission staff, *see, e.g.,* AR 567, 712, 1284, 1392, 1578, 1580, and, indeed, directly to some of the Commissioners themselves. AR 705–729. Honickman and some of his attorneys voluntarily appeared before FTC staff and gave testimony at an investigational hearing. AR 1479–1542. Staff memoranda to the Commission indicate that these arguments and data were considered. AR 1665–1682, 1705–1706, 1716–1717. Thus, given both the access to the Commission and its staff and the informal procedures to which Honickman agreed, the Court can see little value in additional or substitute procedural safeguards.

Finally, the FTC's interest encompasses not merely its statutory mandate to investigate and hold administrative proceedings to prevent or remedy mergers which it finds may substantially lessen competition or tend to create a monopoly. *See* 15 U.S.C. § 21(b). The Commission also has an interest, consistent with its broad remedial discretion in antitrust enforcement, in settling its administrative complaints with parties who choose not to contest them. *See West Texas Transmission,* 1989–1 Trade Cas. ¶ 68,424, at 60,333, 1988 WL 156330. The goal of efficiency in antitrust enforcement is undoubtedly enhanced when the FTC can achieve its statutory objectives without having to engage in costly and time-consuming litigation. This goal redounds, moreover, to the benefit of parties, like Honickman here, who also wish to avoid expensive litigation. Imposing an additional requirement of a formal, on-the-record hearing would undo these benefits by throwing the case back into the adversarial posture that the parties had sought to avoid in agreeing to settle the administrative complaint in the first place.

In short, the Court discerns no violation of plaintiffs' right to due process in the procedures employed by the FTC in reviewing Honickman's application for prior approval.

## B. *Review of the FTC's Denial of Honickman's Application to Acquire Seven–Up Brooklyn*

Having determined that the procedures followed by the FTC violated neither the APA nor the Constitution, the Court must now consider whether the FTC's denial of Honickman's application of to acquire Seven–Up Brooklyn was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Like the deferential substantial evidence test, this standard of review requires the Court not to substitute its judgment for that of the FTC, but rather to defer to the Commission so long as the Court finds that its decision was reasoned and that the facts on which the Commission relied "have some basis in the record." *National Treasury Employees Union v. Horner,* 854 F.2d 490, 498 (D.C.Cir.1988); *see also Hospital Corp. of America v. F.T.C.,* 807 F.2d 1381, 1385 (7th Cir.1986) (applying same degree of deference to FTC under the substantial evidence test), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987); *Association of Data Processing Serv. Orgs., Inc. v. Board of Governors of Federal Reserve Sys.,* 745 F.2d 677, 683–84 (D.C.Cir.1984) (no substantive difference between substantial evidence and arbitrary and capricious tests). Having reviewed the administrative record

in this case, the Court finds that the FTC's decision meets these requirements.

■ The FTC's decision denying Honickman's application was communicated in the letter of October 3, 1991, from Secretary of the Commission to Honickman's attorney. That letter articulated a satisfactory explanation for the Commission's decision, "including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The explanation made reference to allegations in the FTC's 1989 complaint against Honickman and included a statement of the relevant legal standards to be applied. The first of those standards is whether the proposed acquisition is likely to lessen competition substantially or tend to create a monopoly in the relevant product and geographic markets. *See Brown Shoe,* 370 U.S. at 316–23, 82 S.Ct. at 1519–23; *FTC v. PPG Indus., Inc.,* 798 F.2d 1500, 1501 (D.C.Cir.1986). The second standard is whether the acquisition would not otherwise conflict with the remedial purposes of the Consent Order. *West Texas Transmission,* 1989–1 Trade Cas. ¶ 68,424, at 60,334, 1988 WL 156330; *In re Beatrice Foods Co.,* 67 F.T.C. 473, 731 n. 48 (1965). As has been explained above, and as was stated in the FTC's letter, Honickman, as applicant pursuant to an outstanding consent order, had the burden of proof under both of these standards. *See* Letter from Secretary Donald S. Clark to James R. Loftis in *Great Lakes Chem. Corp.,* Docket No. 9155 (Public Version) (Sept. 4, 1991); Letter from Acting Secretary Phyllis A. Johnson to G. Anthony Campbell in *Flowers Indus., Inc.,* Docket No. 9148 (Mar. 31, 1988).

Honickman—and DPSU—argued to the FTC that the former's acquisition of Seven–Up Brooklyn's Seven–Up franchise would be procompetitive because it would create cost efficiencies in the distribution and marketing of Seven–Up products in the New York metropolitan market. AR 52–53, 1430–1437. Specifically, plaintiffs—especially DPSU—repeatedly pointed out to the FTC the cost advantages that would accrue from allowing a small concentrate manufacturer (like DPSU) to "piggyback" on the distribution network of a local bottler of one of the two major brands (Coke and Pepsi),[14] rather than to continue distribution through third or fourth bottlers or to resort to warehouse distribution or beer distributors. Third bottlers are usually much smaller operators who do not enjoy the same economies of scale as Coke or Pepsi distributors. AR 1429–1437, 1682–1696. In this case, claims DPSU, piggybacking on the local Pepsi distributor (Honickman) would enable Seven–Up to compete effectively with Sprite and lemon-lime Slice (respectively the Coke and Pepsi competitors of the "Un–Cola") in a major geographic market. AR 1430, 1432.

The Court finds merit in plaintiffs' argument, but that does not render the FTC's decision arbitrary and capricious. For, as the Commission pointed out to Honickman, an acquisition that lowers costs may still be unlawful "if it results in an increased likelihood of higher prices." AR 233. And all that matters in a Section 7 analysis is that the merger or acquisition "create an appreciable danger of such consequences in the future." *Hospital Corp. of America,* 807 F.2d at 1389 (citing *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 362, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963)).

There is ample evidence in the record from which the Commission could rationally conclude that such an outcome was likely. The Commission had facts before it from which it could conclude that Honickman's acquisition of Seven–Up Brooklyn's assets would reduce the number of bottlers in an already-concentrated market, *see* AR

**14.** The critical role of local bottlers in the distribution and marketing of the products of national concentrate manufacturers is a feature of the carbonated soft drink industry and received extensive analysis by Judge Gesell in *FTC v. Coca-Cola,* 641 F.Supp. 1128, 1134–1137 (D.D.C.1986), *vacated as moot,* 829 F.2d 191 (D.C.Cir.1987).

Much of Judge Gesell's analysis, including his discussion of the position of small concentrate manufacturers, third bottlers, piggybacking and alternative channels of distribution, applies to the facts of this case. *Compare id. with* AR 1429–1438.

49, 1676–1682, 1703, 1787, thus permitting the inference that collusion among the significant remaining players was likely. *See Hospital Corp. of America*, 807 F.2d at 1386; *PPG Indus., Inc.*, 798 F.2d at 1503. The record, moreover, clearly indicates that Honickman's distribution of Seven–Up would force Pepsi's lemon-lime Slice product from this market, leaving thirsty consumers with a choice between two lemon-lime sodas (Seven–Up and Sprite) instead of three. AR 1697, 1700–1701, 1705, 1716, 1930–3. There was also a likelihood that the distribution of other minor brands of carbonated soft drinks previously distributed by Seven–Up Brooklyn, such as RC Cola, would be adversely affected. AR 1685, 1829–1, 1830–1. The record also provides support for the view that the acquisition of the Seven–Up bottling franchise by the Pepsi bottler would increase the barriers to entry to new bottlers, because Seven–Up would be unavailable to bottlers seeking to build up the requisite market share to compete effectively with Coke and Pepsi products. AR 52–53, 1372, 1704, 1706–1708. Whether an acquisition would increase barriers to "potential competition from firms not presently active in the relevant product and geographic markets" is, of course, highly relevant in assessing an acquisition's probable anticompetitive effects. *United States v. Waste Management, Inc.*, 743 F.2d 976, 982–83 (2nd Cir. 1984). In short, the record supports, if it does not compel, the FTC's conclusion that Honickman and DPSU failed to show that the acquisition of Seven–Up Brooklyn would not substantially lessen competition in the relevant markets.

■ Honickman also raised the failing firm doctrine in support of his application. AR 53–56. This judicially-created defense to a Section 7 suit is to be narrowly construed. *See FTC v. Harbour Group Invs., L.P.*, 1990–92 Trade Cas. (CCH) ¶ 69,247 at 69,914, 1990 WL 198819 (D.D.C.1990) (citing *Citizen Publishing Co. v. United States*, 394 U.S. 131, 139, 89 S.Ct. 927, 931, 22 L.Ed.2d 148 (1969)). A litigant invoking this defense must show 1) that the merging firm faces " 'a grave probability of a business failure,' " *United States v. General*

*Dynamics Corp.*, 415 U.S. 486, 507, 94 S.Ct. 1186, 1198, 415 U.S. 486 (1974) (citing *International Shoe Co. v. FTC*, 280 U.S. 291, 302, 50 S.Ct. 89, 93, 74 L.Ed. 431 (1930)); 2) that the prospects of successful reorganization under the bankruptcy laws are "dim or nonexistent," *Citizen Publishing*, 394 U.S. at 138, 89 S.Ct. at 931; and 3) "that it tried and failed to merge with a company other than the acquiring one." *Id.* (citing *Citizen Publishing*, 394 U.S. at 138, 89 S.Ct. at 931; *United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 555, 91 S.Ct. 1692, 1696, 29 L.Ed.2d 170 (1971)). With regard to the third requirement, the Supreme Court has stated that "[t]he failing company doctrine plainly cannot be applied in a merger or in any other case unless it is established that the company that acquires the failing company or brings it under dominion is the *only* available purchaser." *Citizen Publishing*, 394 U.S. at 138, 89 S.Ct. at 931 (emphasis added). Courts interpreting this requirement have described its burden as "quite heavy," *Harbour Group Investments*, 1990–92 Trade Cas. ¶ 69,247 at 69,915, 1990 WL 198819 (citing cases), and have held litigants asserting the defense to a showing that good faith efforts were made to find an alternative purchaser. *Id.* at 69,915–917. The FTC found that Honickman had failed to establish that he was the sole plausible acquirer of Seven–Up Brooklyn. AR 234.

■ The record certainly indicates that some FTC staff felt that Honickman would have "a very formidable failing firm defense" in the event the FTC was forced to sue for divestiture should DPSU grant Seven–Up franchises to Honickman after a Seven–Up Brooklyn liquidation. AR 1418. Among other things, the record shows that the bankruptcy judge issued an order containing findings of fact that Seven–Up Brooklyn was a failed business unable "to recommence operations or continue in its normal course of business," AR 561, and that the Honickman/DPSU proposal for Honickman to acquire Seven–Up Brooklyn was "the only proposal that might provide for a distribution to the unsecured credi-

tors of the estate even with the FTC approval process taken into consideration." AR 562.[15] The record further reflects that, on January 17, 1991, prior to the hearings preceding the bankruptcy judge's order, *see* AR 261, 473A, DPSU engaged the services of Robert T. Shircliff and Associates, Inc., to undertake a search for other potential buyers for Seven–Up Brooklyn. AR 569, 581–582. The Shircliff search failed "to produce a viable, acceptable" buyer. AR 575.

Nevertheless, it is clear from the record that the FTC could rationally conclude that Honickman and DPSU had failed to meet the requirements of the failing firm doctrine. First, the Commission could conclude that Honickman was to some degree at fault in the failure of Seven–Up Brooklyn. The record indicates that Honickman may well have acquired Seven–Up Brooklyn in 1987 to thwart the efforts of another local bottler, New York Seven–Up Bottling Co., from merging with Seven–Up Brooklyn, thereby preventing the creation of a viable third bottler in the New York metropolitan market. AR 1104–1105, 1656–1657. The record also indicates that Honickman structured his purchase of Seven–Up Brooklyn through entities he controlled so as to avoid disclosing the merger as required by the HSR Act, 15 U.S.C. § 18a. AR 1041–1049, 1345, 1347. Finally, the record indicates that Honickman, having only partially divested his interests in Seven–Up Brooklyn in 1988 to his former business partner, Lance T. Funston (who subsequently admitted to being unqualified to run the business, *see* AR 1806–10, 2067–5, 1659), jeopardized the remaining viability of the company by charging it exorbitant rents on leases he held and by remaining a guarantor on part of its financing. AR 386–387, 394, 1329, 1787–1788, 1791–94, 1881–2, 1884–1, 1888–2. In short, the rec-

ord provides some support for the conclusion that Honickman was *in pari delicto* with regard to Seven–Up Brooklyn. AR 1649–1650.

Second, the FTC could rationally conclude that Honickman and DPSU failed to establish that the former was the "only available purchaser" for Seven–Up Brooklyn. *Citizen Publishing*, 394 U.S. at 138, 89 S.Ct. at 931. Notwithstanding the bankruptcy judge's finding to the contrary, the transcript of a February 27, 1991, hearing in the bankruptcy court contains testimony, including skeptical comments of the judge herself, supporting the conclusion that DPSU and Honickman had discouraged other potential buyers from bidding for Seven–Up Brooklyn. AR 324–325, 383, 386–387, 388, 392, 393, 417, 418–421, 1650, 1709. There is, moreover, factual support in the record for the conclusion that the Shircliff search for alternative buyers was inadequate. *See Harbour Group*, 1990–2 Trade Cas. ¶ 69,247 at 64,915–917, 1990 WL 198819. In particular, the FTC could rationally conclude, from the selection criteria provided by DPSU to Shircliff and employed by the latter, that the search favored bottlers who *already* held strong positions in the local market. AR 575, 589, 2047–1, 2047–5. The record also reflects that Shircliff simply failed to contact other potential buyers among nearby bottlers of Seven–Up and other soft drinks. AR 1670–1671, 2047–1, 2047–5, 2047–6. Finally, the record shows that a draft asset purchase agreement between DPSU and Seven–Up Brooklyn (subsequently submitted to the bankruptcy court), pursuant to which DPSU would convey assets it purchased from Seven–Up Brooklyn to Honickman, *see* AR 100, was prepared within approximately ten days of the date on which DPSU contracted for the Shircliff search for potential buyers. *See* AR 582.[16] This

---

**15.** These findings appear in an Order Approving Asset Sale And Granting Related Relief, In re Seven–Up Brooklyn Bottling Company, Case No. 090–71516–21 (Bankr.E.D.N.Y. May 2, 1991), signed by United States Bankruptcy Judge Cecelia H. Goetz, which appears at AR 551–566.

**16.** The engagement letter between DPSU and Robert T. Shircliff and Associates was signed on

January 17, 1991. AR 582. The draft asset purchase agreement was prepared on or about January 25, 1991. AR 95. That agreement was submitted to the bankruptcy court on January 28, 1991. AR 78. The letter to DPSU reporting the results of the Shircliff search was dated June 10, 1991, several months after the bankruptcy court's order approving the sale of Brooklyn Bottling to Honickman. AR 574.

timing does suggest that DPSU had decided to deal with Honickman only and that the Shircliff search was "designed primarily to be perfunctory." *Harbour Group,* 1990–2 Trade Cas. ¶ 69,247 at 64,916, 1990 WL 198819. While the foregoing items do not necessarily *compel* the conclusion that Honickman was not the only available purchaser for Seven–Up Brooklyn, they do provide record support for the FTC's denial of Honickman's failing firm argument for the reasons given in the October 3, 1991, letter, thus compelling this Court's conclusion that the Commission's decision was not arbitrary and capricious. *See Horner,* 854 F.2d at 498.

Finally, the FTC denied Honickman's application on the grounds that he had failed to demonstrate that the proposed acquisition would not conflict with the remedial purposes of the Consent Order. AR 234–235. Because the application was made pursuant to the terms of the Consent Order, it is clear that the Commission was entitled to consider this factor. *West Texas Transmission,* 1989–1 Trade Cas. (CCH) ¶ 68,424, at 60,334, 1988 WL 156330; *Louisiana–Pacific Corp.,* 569 F.Supp. at 1147; *In re Beatrice Foods Co.,* 67 F.T.C. 473, 731 n. 48 (1965). And, as has been previously explained, it was entirely proper for the Commission to consider its 1989 complaint against Honickman, AR 0–9, which established a *prima facie* Section 7 violation, in defining the remedial purposes of the Settlement Agreement that settled that complaint. AR 6, 1655. The Court finds, further, that the record amply supports the Commission's conclusion that Honickman's 1991 application raised substantially the same antitrust concerns as were set forth in the 1989 complaint. *See* AR 4–5, 48, 99, 1649, 1703–1704. Thus, the Court finds the FTC's decision on these grounds to be rational as well.

### C. *Conclusion*

Plaintiffs have argued long and hard to this Court that the FTC's decision should be treated as a new Section 7 case and reviewed *de novo.* It is understandable that they would try to escape the deference accorded agency action under the APA. In the final analysis, however, this is not an antitrust case, but an administrative review case, and must be reviewed accordingly. Thus, having examined the FTC's decision denying Honickman's application to acquire Seven–Up Brooklyn, and having reviewed the administrative record, the Court is well satisfied that the Commission "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). Having found that the FTC's decision meets this standard, the Court is precluded from finding that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court, however, commends counsel for the parties on the high quality of their briefs and memoranda.

For the reasons set forth above, the Court will this day enter an Order granting the Motion for Summary Judgment of defendant FTC, denying the Motion for Summary Judgment of plaintiffs DPSU and Honickman, and dismiss the case.